CASE 95—PROSECUTION AGAINST A. P. TAYLOR, FOR EMBEZZLEMENT.—
JUNE 18, 1903.

(Omitted in former reports.)

# Taylor v. Commonwealth.

APPEAL FROM FAYETTE CIRCUIT COURT—WATTS PARKER, CIRCUIT
JUDGE.                        ·

DEFENDANT CONVICTED AND APPEALS.    REVERSED.

CORPORATIONS—DIVIDENDS— FRAUDULENT    DECLARATION — OFFICERS —
RECEIPT OF DIVIDENDS—EMBEZZLEMENT—STATUTES—CONSTRUCTION
—PENALTY — INDICTMENT — DUPLICITY — EVIDENCE—MOTIVE—IN-
STRUCTION.

1. Where an investment company's by-laws provided that a sur-
plus fund, consisting of 5 per cent. of the weekly collections or
dues, should be used or invested as the directors might elect for
the best interest of the company, and an expense fund, consist-
ing of 10 per cent. of the weekly collections and dues and trans-
fer fees, should be used for current and such other expenses
as the directors might direct, such by-laws did not authorize
the directors of the corporation, while insolvent, to distribute
dividends from such funds as against creditors of the corpora-
tion.

2. Under Criminal Code, section 128, providing that if an offense
involves the commission of an injury to person or property or
the taking of property, and be described in other respects with
sufficient certainty to identify the act, an erroneous allegation
as to the person injured or as to the owner of the property is
immaterial, an indictment charging the defendant, as presi-
dent of a certain corporation, by virtue of his office received
and took certain moneys or property of the company, and of
divers persons unknown who had intrusted the same to the ·
keeping of the company, and did then and there feloniously,
and with intent to wilfully injure and defraud such company
and such persons, embezzle and convert the money to his own
use, was not demurrable as charging two offenses, one the em-
bezzlement of money of the corporation, and the other the em-
bezzlement of money of such other persons.  .

3. Under Kentucky Statutes, 1899, section 1202, providing that if
any officer of a corporation shall embezzle or convert funds of

the corporation, or funds placed in his care as an officr, he shall be fined, etc., an indictment of the president of a corporation, charging that certain money came into his hands by virtue of his position, and that he converted the same fraudulently, etc., was sufficient.

4. In a prosecution of the president of an insolvent corporation for embezzlement of its funds, committed by the voting and receiving of unearned dividends from the corporation's assets, it, was no defense that such dividends were voted, and the payment thereof concurred in, by all the stockholders, on the ground that they were the owners of the corporation's assets, such assets being owned by the corporation as a separate entity distinct from the stockholders.

5. In a prosecution of the president of an insolvent corporation for the embezzlement of its funds in the receipt of dividends voted with his consent from the corporation's assets while it was insolvent, a conviction could be maintained only on proof of knowledge that the corporatin had no funds legally applicable to dividends when such dividend was declared and paid, and that such declaration and payment was with the fraudulent purpose of converting the corporation assets to the use of the officers and stockholders.

6. In a prosecution of the president of an insolvent corporation for embezzlement in receiving dividends declared during insolvency, evidence of the corporation's insolvency, together with the evidence that other dividends had been declared and received about the same time, including a transfer of the corporation's assets to another company and its actual condition at the time of the transfer, was admissible to show the motive of the directors in declaring the dividend which was the basis of the charge.

7. Where, in a prosecution of the president of an insolvent corporation for receiving. dividends alleged to have been fraudulently declared, it appeared that the business of the corporation in itself was incapable of being successfully carried on, and evidence of other dividends declared from its assets was admitted on the issue of motive, the court should have limited such evidence solely to that issue by an instruction.

8. Where, in a prosecution of an officer of an insolvent corporation for embezzlement in declaring and receiving dividends from certain funds not applicable to dividends as against creditors, evidence that other like companies had been accustomed to divide the proceeds of such funds among their stockholders was immaterial. ·

9. In a prosecution of the president of an insolvent corporation for embezzlement in the declaration and receipt of dividends from

certain funds of the corporation, evidence that defendant and
his co-directors believed and were advised by counsel that they
were authorized to declare and receive dividends from such
funds was admissible.

10. Kentucky Statutes, 1899, section 548, making directors liable
for all debts of a corporation on payment of a dividend while
the corporation is insolvent, or which would make. it
insolvent, and section 550, providing a fine against di-
rectors who violate any of the provisions of the chap-
ter relating to corporations, merely relate to acts of omission
or misfeasance, and do not apply to the embezzlement of cor-
porate assets by the fraudulent declaration of a dividend while
the company is insolvent, with intent to convert the corpora-
tion's assets to the use of the stockholders, prohibited by sec-
tion 1202.

11, In a prosecution of the president of an insolvent corporation for
embezzlement in the declaration and receipt of a dividend, fail-
ure of the court to submit to the jury the issue of the fraudu-
lent actions of defendant's co-directors in declaring and paying
such dividends was error.

12. In a prosecution of the president of an insolvent corporation
for embezzlement in the declaration and receipt of dividends
alleged to have been appropriated by him fraudulently and with-
out right, failure of the court to define the limitations of the
term "right" and the meaning of "fraudulent" was error.

13. In the prosecution of the president of an insolvent corporation
for embezzlement in fraudulently declaring and receiving div-
idends, the court should have charged. that fraudulent con-
version of such dividends was the deceitful, intentional appro-
priation of the corporation's property without right or a belief
of right, and a fraudulent intent was the intent to effect such
appropriation.

OPINION OF THE COURT BY JUDGE O'REAR—REVERSING.

Appellant prosecutes this appeal from a verdict and judg-
ment convicting and sentencing him under a charge of em-
bezzlement. He and four others, in May, 1900, organized,
as corporators, the Industrial Mutual Investment Company.
Its authorized capital stock was $5,000, of which each one
of the incorporators subscribed $1,000. They then paid in
on their several subscriptions the sums of $50 each, execut-
ing their notes to the company for the balance. Whether

they ever actually paid any of this balance is not perfectly clear, although they claim that they did. The object of the corporation, as stated in the articles, was as follows: "The nature of the business and the object and purposes proposed to be transacted, promoted and carried out by said corporation, shall be the issuing and selling with the right to redeem: Certificates of Membership in the Corporation, subject to the terms, conditions, restrictions and limitations named in said certificates of said corporation. The conditions, terms, restrictions and limitations shall be named in each certificate of membership, and shall be constituted and become a part thereof. Also the buying or selling of real estate and personal property, bonds, stocks and securities of all kinds, and the investment of accumulations and the surplus in real estate, stocks, bonds and other securities."

It may be here stated that the corporation never in fact did any other business, so far as the record shows, than issuing the membership certificates alluded to.

These certificates of membership were sold to the public. Exactly what relation the holders then bore to the corporation does not seem to have been clearly understood by the incorporators or the dealers. The incorporators insist most earnestly, and back their contention by the opinion of counsel procured before they embarked in the enterprise, that the certificate holders were in no sense members of the corporation, and were not entitled in any event to share in its profits or net accumulations. By a statement contained in the charter, limiting the corporation's indebtedness to $5,000, it is indicated that they were not regarded as creditors either. It may be as well to say now that their relation was that of creditors of the corporation. The contract represented by the "membership certificate" was as follows:

"Certificate of Membership.

"The Industrial Mutual Deposit Company.

"Lexington, Kentucky.

"These Presents Witnesseth, that ——— of ———, State of ———, has filed an application, which is a part of this contract, and has paid the Industrial Mutual Deposit Company, of Lexington, Ky., (a corporation) the sum of—— Dollars, it being for one week's installments on ——— coupons numbered serially from ——— which coupons are a part hereof.

"Now, in consideration of said payment and the further agreement of the holder thereof, on or before of each Monday of each week, from the date of the issuance of these coupons, to pay at the office of the Company, or to some duly authorized agent thereof, five cents upon each redeemed coupon made a part hereof, as said before, and so on, continuing until all of said coupons shall be redeemed by said company.

"The said Industrial Mutual Deposit Company promises and agrees to pay to said ——————— or to his or her heirs, personal representatives, or assigns upon the redemption of each of said coupons, one dollar and sixty cents ($1.60) on every dollar ($1.00) paid to keep same in force to the date of redemption less ten cents (10c) on each coupon when redeemed.

"The terms and conditions printed on the back hereof, and in the application for same are made a part of this certificate as fully as if recited over the signatures hereto affixed.

"In Testimony Whereof, The Industrial Mutual Deposit Company has caused these presents to be executed by its

President and Secretary, and its corporate seal to be affixed, in the City of Lexington, Kentucky, this the July 23, 1900.

A. P. Taylor, President

"(Seal.)　　　　　　　Frank Gilmore, Secretary.

"(Conditions.)

(1)　If any installment of weekly dues be not paid on Monday of any week, then the coupon upon which default is made shall be marked void for that week, and shall not be entitled to participate in the Redemption fund for said week; and if such default continues for four consecutive weeks, then this contract shall become void, and of no effect, and the holder thereof shall forfeit all money paid on same to the Company.

"(2)　The coupons hereto attached shall not be eligible for Redemption until eight weekly installments of dues shall have been paid thereon.

"The Company reserves the right to redeem said coupons, or any of them, at any time in the manner provided for by the By-Laws of said Company, and upon the payment of the amount hereinbefore promised, and binds itself to redeem all coupons, within one hundred and four weeks upon which one hundred and four weekly payments have been made.

"(3)　The weekly collections on dues are divided into eight funds namely:

"(a)　General Redemption Fund,—which consists of 20 per cent. of weekly collections on dues, and is used to redeem coupons that are eight or more weeks old, and are in force by a fixed mathematical rule, numeral apart system, which is determined each week by the number and value of each eligible coupon in force; and by the amount of money in said fund.

"(b)　Mortuary-Fund, which consists, of 10 per cent. of the weekly collections on dues and is used to pay off death

claims. If there are no death claims any week, this Fund is added to the General Redemption Fund and is used for the same purpose.

"(c)   Special Redemption Fund, which consists of 10 per cent. of collections on weekly dues, and is used to redeem every tenth eligible coupon in force each weekly Redemption.

"(d)   Grand Special Redemption Fund, which consists of 15 per cent. of the collections on weekly dues, and shall be used to redeem the oldest coupon in force on the Register consecutively.

"(e)   Cash Surrender Fund, which consists of 10 per cent. of the weekly collections on dues, and is used the 30th week and each week thereafter, to pay cash surrender claims. If there are no such claims at the 30th week or thereafter, this fund shall be added to the Grand Special Redemption Fund, and shall be used for the same purpose. Up to thirty weeks this fund shall be added to the Grand Special Redemption Fund and every other week thereafter unless there be a cash surrender claim. Thus increasing the Grand Special Redemption Fund to 25 per cent. of weekly collections on dues, said increased fund to be used as above set forth.

"(f)   Reserve Fund, which shall consist of 20 per cent. of the weekly collections on dues, and income derived from the investment of said fund and such other sums as the Board of Directors may add, and shall be used to guarantee the payment of all matured obligations of the company by reason of the issuance of certificates:

"At no time shall the reserve exceed by 20 per cent. the entire amount paid in on unredeemed coupons.

"When amount at any time shall exceed said sum it shall be passed to the General Redemption Fund.

"(g)   Surplus Fund, which shall consist of five per cent.

of the weekly collections on dues, and shall be used or invested as the Directors may elect for the best interest of said company.

"(h) Expense Fund, shall consist of ten per cent. of the weekly collections on dues and of the transfer fees, and shall be used for the current expenses of the company, and for such other purposes as the Directors may direct.

"(4) All coupons are numbered consecutively.

"(5) Death Options. In the event of the death of the holder of this certificate, his or her heirs or personal representatives may accept the following options, to-wit: (First) accept in cash all money paid in on unredeemed coupons less ten per cent. on each coupon.

"(2nd) May continue this contract, for the benefit of the decedent's estate. The payment of death claims shall be from the Mortuary Fund and are to be paid in the order of their applications for same.

"(6) Borrowing Option. After 24 or more weekly dues have been paid the holder may borrow all the money in the reserve fund that has been placed there from the weekly dues by said holder. Said loan to be applied to the payment of dues on said coupons, and said coupons shall be assigned to the Trustees of Reserve fund as collateral for said loan. Said loan shall bear six per cent. interest per annum and shall be paid out of the first maturing coupons.

"(7) Surrender Cash Options: After 30 or more weekly dues have been paid, the holder may surrender this contract and receive in cash ninety per cent. of all money paid in on unredeemed coupons hereto attached. Cash Surrender option to be paid out of cash surrender fund in the order of application for same.

"(8) Application for any option:—offered in this contract to be effective must be made in writing within two

weeks after the last weekly dues were paid otherwise the Company will not be bound by them, nor will it be bound to extend any of these options until after two weeks from the date of application.

"(9)    These Coupons are only transferable on the books of the Company, and for such transfer one-half cent will be charged on each coupon.

"(10) All remittances, for credit on coupons are sent at the risk of the sender or holder thereof.

"No receipt for dues is official, nor will any be accepted, unless signed by an authorized agent.

"(11)   The Company, will be bound only by such statements as are contained in this contract.

"No agent, General or Special, of this Company has any right to vary or change in any way any part of this contract.

"(12)   The holder by acceptance hereof, admits he has read and understands this contract.

"The above contract with its conditions as recited above is hereby made and becomes a part of the By-Laws of this corporation.

"(Form of Coupon.)

"Coupon No. ————.

"The Industrial Mutual Deposit Company, Agrees to re-deem this Coupon, according to the conditions named in the contract of which this is a part.

A. P. Taylor, President.

Frank Gilmore, Secretary."

The "numeral apart" system referred to in the contract was this:  A certain per cent., say 1 per cent., of the coupons in force, was taken as a basis of distribution.  If 1 per cent. of the coupons in force when a distribution occurred was, for example, 50, then every fiftieth coupon that was eight weeks old, or older, would be redeemed at the rate

of $1.50 net, without regard to what sum had been paid on it, except that at least eight payments must have been made. This redemption was made from the "reserve fund" provided in the contract, so far as the money on hand to the credit of those funds would permit. These redemptions occurred weekly.

It is perfectly patent that the scheme attempted was impossible of execution honestly, so as to perform all the contracts. The most charitable view to take of it is that it was a species of lottery. It took the money paid in by new "members" in one week to "redeem" the coupons sold to others more than eight weeks before. If the theory of the appellant and his associates be adopted, that the 10 per cent. of each certificate sold should go into an "expense fund," and 5 per cent. into a "surplus fund," neither of which could in any event be enjoyed by or divided among the holders of the certificates, then it was mathematically certain that, out of the remaining 85 per cent. of all the money paid in, the corporation could not in two years pay back, to those who paid it in, 150 per cent., as it had no other resources or income. If the articles of incorporation had contemplated only the character of business above alluded to, we would have some doubt whether it would have to become a corporation in fact, as we are not prepared to say that persons may avail themselves of corporate powers to do an illegal business, even to the extent of becoming a de facto corporation. So far as the manifest purposes of this corporation are concerned, they do not appear to have been illegal. That the directors subsequently adopted a method that made their transactions violative of law cannot affect the fact that the corporation's existence was lawful. If their contracts were void because mutually engaged in by the parties with the understanding on both sides that the corporation was con-

ducting a lottery scheme alone, then it may be doubtful if the policy holders would have any claim upon the courts to enforce their contracts against the corporation as liabilities. Such understanding, however, was not shown, nor attempted to be shown in this case. So far as this record discloses, the purchasers of the coupons were innocent of such knowledge or connivance. Many features of the contract may have been possible of performance, and without legal objection. It was the duty of the corporation to have employed and distributed the funds received by it for the sale of membership certificates so as not to have broken the law, and so as to have complied with the undertakings to holders as nearly as possible, by honest and legal methods of dealing. If they could not do that, it was then their duty to refund the money received, with its interest.

As to how the "surplus" and "expense fund" provided for in these contracts were liable to distribution by the corporation becomes a material inquiry in this case. The provisions of the contract—which are identical with the by-laws of the company on that subject-are repeated here for convenience: "(g) Surplus fund, which shall consist of five per cent. of the weekly collections on dues, and shall be used or invested as the Directors may elect for the best interest of the company. (h) Expense fund, shall consist of ten per. cent. of the weekly collections on dues and of the transfer fees and shall be used for the current expenses of the company, and for such other expenses as the directors may direct." It is the argument on behalf of appellant that these two funds were, by the express terms of the contract, set apart to the uses of the corporation proper, as distinct from certificate holders, and that it was contemplated by the contracts that the corporation might do with these funds what it pleased; that in no event or contingency were the cer-

tificate holders entitled to share in their distribution. In our opinion, nothing in the language employed, when it is fairly interpreted by its commonly understood meaning, exempts this corporation from its statutory and common-law liability as such to its creditors. That liability is first to pay to its creditors their demands in full, or to provide therefor, before the stockholders are entitled to distribute anything among themselves as dividends, or otherwise than in legitimate expenses actually incurred in the business. If the corporation is solvent when it pays dividends to stockholders, and their payment does not impair its capital and resources set apart to pay its debts, then the discretion of its directors in declaring and paying the dividends will not be questioned. The corporation in this case has not the right, if it was in fact insolvent, to distribute about 20 per cent. of its assets among its stockholders as dividends, when all of its assets would not pay its liabilities.

The board of directors of the corporation met on May 14, 1901, and declared a dividend of $2,500 ($500 to each stockholder) payable to themselves; they did the same on June 27, 1901, and repeated it August 5, 1901. On November 4, 1901, they, by resolution, appropriated to themselves each $500 "on account," and on December 30, 1901, appropriated $300 more to each of themselves "on account." In March, 1902, the affairs of the company were placed in the hands of a receiver, as an insolvent. The grand jury of Fayette county indicted appellant, who was president of the board of directors, on the count of fraudulently converting and embezzling $500 of the funds of the corporation. This $500 was the part of the dividend declared March 14, 1901, that was paid to appellant as one of the five stockholders. The descriptive part of the indictment is in these words: "That the said A. P. Taylor on the third day of May, 1902, in the

county aforesaid was the president and a director of a cor-
poration known as the Industrial Mutual Deposit Company,
a corporation duly incorporated under the laws of the State
of Kentucky, and being such President and Director of said
corporation, did then and there, by virtue of his said office
and employment and while he was so employed and acting
as such President and Director aforesaid, receive and take
into his possession United States Bank notes, currency and
silver coin, commonly known as money, of the value of $500,
the property of said company and of divers persons whose
names are unknown to the grand jury, who had intrusted
such money into the custody and keeping of said company,
and to the said Taylor as an officer thereof, did then and
there unlawfully and willfully and feloniously and with in-
tent to willfully injure and defraud the said company and
the said persons, embezzle the said money and convert the
same to his own use, and that too at a time different from
that mentioned in indictments Nos. 1 and 2 and 4, against
the peace, etc." The indictment was under section 1202, Ky.
St. 1899, as follows: If any officer, agent, clerk or servant
of any bank or corporation shall embezzle, or fraudulently
convert to his own use or the use of another, bullion, money,
bank notes, or any effects or property, belonging to such
bank or corporation, or other corporation or any person,
which shall have come to his possession or been placed in
his care or under his management as such officer, agent,
clerk or other servant, he and the person to whose use the
same was fraudulently converted, if he assented thereto,
shall be confined in the penitentiary not less than one nor
more than ten years." A demurrer to the indictment was
interposed, because it is claimed it charges two offenses:
One, in that appellant embezzled the money of the corpora-
tion; and the other, that he embezzled the money of various

persons, other than the corporation, and unknown to the grand jury.

We are of the opinion that but one offense was charged, that is the taking of a certain $500 in one fund and at one time. Its ownership was not material, further than that it must be charged and shown to have belonged either to the corporation of which appellant was an officer or agent, or to some person who had entrusted its possession to that corporation. Section 128, Cr. Code, appears to us to control this question. It reads: "If an offense involves the commission of, or an attempt to commit an injury to person or property, or the taking of property, and be described in other respects with sufficient certainty to identify the act, an erroneous allegation as to the person injured or attempted to be injured, or as to the owner of the property taken or injured or attempted to be injured, is not material." This court has uniformly held that where the act within this section is particularly and sufficiently described, so that it may be identified as the one which the accused is called upon to answer, whether the owner of the property taken or inujred is correctly named is immaterial. McBride v. Com., 13 Bush, 337; Johnson v. Com., 87 Ky. 189, 10 R. 100, 7 S. W. 927; Olive v. Com., 5 Bush, 376; Hennessy v. Com., 88 Ky. 301, 10 R. 823, 11 S. W. 13. Under the section of the statute quoted, the distinguishing features of the crime of embezzlement are that the official should have come into possession of the property converted by reason of the confidence and trust reposed in him by virtue of his position, and that he should have converted such property fraudulently; in other words, it is to punish fraudulent breaches of trust when committed by such persons. The indictment contains all necessary averments showing the com-

mission of this offense, and the demurrer was properly over-ruled.

The learned circuit judge, in the exercise of extreme caution, restricted the evidence to rather narrow bounds, as affecting both the prosecution and the defense. Without noticing each feature of it in detail, we will state the principles which, in our opinion, should control the investigation. The argument is presented for appellant that in view of the fact that all the stockholders and directors of the corporation (there being but five of them) concurred in the act of declaring the dividends and in the wrongful appropriation of the money, if it was wrongfully done, a peremptory instruction in behalf of the appellant should have been given to the jury. This argument is predicated upon the theory that the corporation is in fact, and after all, merely the aggregation of its stockholders, that the stockholders are the actual, or at least the beneficial, owners of its assets; and that it is impossible in law for one to steal his own property. The argument denies the existence of the corporation as a separate legal entity. In a somewhat different form, but no less persuasive in its logical application, this argument has been variously made before. For example, it was once held that a corporation, being an intangible, soulless, fictitious creation, a mere legal and commercial convenience, could not be guilty of negligence, or, indeed, of any tort. Especially was it held that it could not commit willful wrongs involving moral turpitude, such as libel and the like, because it could not have the malicious intent, the wicked mind, whose presence was an essential ingredient to the offense. Thompson Corp. §§ 6275-6321, 6299, and cases there collated. It was once argued, and in conformity held, that neither could a corporation be guilty of infractions of the statutes and criminal laws, for the same reasons. In

all these cases it was argued that the wrongful act was ultra
vires, and that only the agent or servant perpetrating it
could be held responsible. Com. v. Swift, etc., T. P. Co.,
2 Va. Cas. 362; Thompson, Corp. 6418; Lord Holt, in 12
Mod. 559, Anon.; Wharton's Crim. Law, § 91. Except as
to such crimes as treason, and others involving personal im-
morality, these theories have long been.exploded. In recent
times the use of corporate qualities has become so extensive
that it would be impossible to continue business under ex-
isting methods on any other basis than to treat the corpora-
tion, concerning the title of its property, and its liabilities
and its rights, as a person. Modern legislation, as well as
almost universal usage, so regard it. In legal contempla-
tion, the title to the property of a corporation is in fact in it,
without regard to who are its members, or how numerous
or how few they may be. It cannot divest itself of this title,
except by its governing body or authorized agents, acting
officially, in some manner permitted by its organic law, or
by such acts of theirs on its behalf as would constitute an
estoppel as against a natural person. Nor is it true, either
in theory or in fact, that a corporation is composed solely
of its stockholders. This creature of law, endowed with
the qualities in law of a natural person to a certain extent,
is charged as such with the duties to hold, and ultimately
to dispose of, the property which it may take, to certain
ends only, viz.: (1) the payment of the debts and other
obligations incurred by it, and (2) to the distribution of
the balance among those who hold its stock, as a corporate
liability, in the proportion fixed by law. The corporation,
so long as it holds property, can not escape doing either
of these things, except by the consent of all who are affected
thereby. True, a great variety of acts and dealings, within
the scope of its lawful powers, it may do, that in fact may

be inimical to the interests mentioned.   These intra vires
acts—matters of judgment and discretion of the governing
body of the corporation—are generally beyond the concern
of the courts.   Three persons may form a corporation, and
may consequently own all the stock.   Beyond a certain limit
they are not liable for its debts, which may largely exceed
that limit.   The corporation alone, then, is liable.   If it be
true that the stockholders may without criminality convert
all its assets to their own use, those dealing with it on the
faith of its property might be irretrievably. injured.   To
prevent just this thing, in part, the Legislature has enact-
ed section 1202 of the statutes against embezzlement by the
officers and agents of corporations.   It recognizes the title
of the property to be in the corporation.   It presupposes
the power of the corporate officers to manage and control
their property in any manner they see fit, except that they
may not fraudulently convert it to their own use or to the use
of another.   It was to preserve the property to the ends re-
quired by law that was in contemplation.   If the corpora-
tion owed nothing, then a division of its assets among all
its stockholders, by their action, would not and could not
be fraudulent as to any person, for it would amount simply
to a voluntary liquidation and dissolution of the corpora-
tion.   That is one of the things it has the right to do after
payment of its debts.   We conclude that the motion for
peremptory instruction was properly overruled.

    The inquiry in this case, therefore, should have been, first,
to learn whether the corporation had assets on May 14, 1901,
which might be lawfully used in paying dividends; that
is, a surplus in fact, whether or not in name.   If it had,
then the motive of the directors in this case in paying the
dividend is immaterial.   If it had not, the question of motive
becomes important and controlling.   If the directors be-

lieved they had the right to pay the dividend, or if they paid it in utter ignorance of their legal right, but without any fraudulent motive against others interested in the assets of the corporation, they can not be guilty of the crime charged. On the other hand, if they at the time knew that there were not funds belonging to the corporation which could legally be used in paying the dividend, and passed the resolution declaring it, and paid it with the fraudulent purpose of converting to their own use the money of the corporation, using the form of declaring the dividend as a blind to cover their peculations, then they are guilty under the statute. McKnight v. U. S., 115 Fed. 972, 54 C. C. A. 358.

We find a case very like the one at bar, in principle, in Reeves v. State (Ala.) 11 South. 158 There, as here, the official came into possession and control of the fund converted, by virtue of his office, and the trust reposed in him by reason of it. Reeves and the other officers of the corporation, under the guise of a legal act, committed a fraud by which they misappropriated the funds of the corporation. We quote from that opinion: "But we do not question that the statute may be violated by fraudulent transactions under the guise of loans, made with full knowledge of the managing officers or agents of the bank. The distinction is between the making of mere irregular, unsafe, or reckless loans of the bank's money, which would amount to maladministration only, and pretended loans, made in bad faith, for personal advantage, and with fraudulent intent, the pretended borrower being an officer, agent, clerk, or servant, having control and custody of money of the bank by virtue of his office or employment, which control and custody is shared by those making the pretended fraudulent loan, and who participate in the fraudulent purpose of the pretended

borrower; and in cases which assume this phase it may become essential that the evidence should be permitted to take such range as to show the relationship existing between such managing officers, their management of the funds of the bank with respect to each other, the transactions they had had or permitted with each other, involving the use of the bank's money, outside of and beyond the usual course of dealing of the bank, similar to or connected with the loan which is brought in question by the indictment, and illustrative of the real purpose and intent with which the latter was made. A transaction such as is herein above referred to would not be a loan in any sense of the law; it would be a fraud; and such fraud may be accompanied by facts and circumstances which would constitute it embezzlement, or a fraudulent conversion to the use of the accused, within the meaning of this statute."

To determine whether the company was solvent on May 14, 1901, proof of its resources and assets, their solvency and security, should have been allowed, as well as of the course and nature of its business and the extent of its liabilities. In this connection, proof of the declaration and payment of the other dividends and sums to the directors and stockholders about the same time, including the transfer to the Germania Company, when the Industrial Mutual Deposit Company sold out to it, and the actual condition of the company at these dates, should have been allowed, as showing or tending to show the motive of the directors, including appellant, in declaring the dividend May 14, 1901. All the transactions of the stockholders to which appellant was a party, in the way of buying coupons in the names of various syndicates, and borrowing the money of the corporation for that purpose on the security of the coupons, should have been allowed for the same purpose. The jury should be

charged, though, as to the purpose of the evidence of other dividends declared, and other transactions permitted to be proved which went solely to the question of motive. This is especially necessary in this case, lest the jury should be allowed to believe that they were trying the accused for engaging in a very questionable enterprise, in which he and his associates appear to have been treated with peculiar partiality, and for the result of its being wrecked to the damage of their patrons; a result that in all likelihood would have happened finally anyhow, if they had attempted to carry out the plan adopted, however fairly.

As appellant could not have alone voted and declared the dividends in question, and therefore could not by such vote or act have taken or converted the money charged, it is essential, to constitute his guilt, that all directors, or at least a majority of them voting in the affirmative, including appellant, if he voted or participated in the act, must have acted in declaring and paying the dividend, and appellant also in receiving it, with the knowledge that their act was illegal, that there were no such funds belonging to the corporation subject to that purpose, and that they each acted with the fraudulent purpose of converting to their own use, and to the use of each other respectively, the money of the corporation. For if the directors other than the appellant, through an honest belief in their right to do so, voted the dividend, although it could not have been legally done, the act was merely maladministration; it was not criminal; and, as the act of voting the dividend was the one by which that money was set apart to the stockholders, the knowledge or purpose of appellant in receiving it can not alone make him guilty. United States v. Britton, 108 U. S. 193, 2 Sup. Ct. 526, 27 L. Ed. 701; Id., 108 U. S. 199, 2 Sup. Ct. 531, 27 L. Ed. 698; U. S. v. Harper (C. C.) 33 Fed. 471; U. S. v. Yout-

sey (C. C.) 91 Fed. 870. It is equally true that if the directors voting the dividend, other than appellant, did so with the guilty knowledge and purpose of committing a fraud upon the corporation, and of converting to themselves its assets, yet if appellant actually believed he had the right to receive it and appropriate it, and acted without fraud, he would not be guilty.

Appellant offered to prove, by officers of other investment companies doing business at Lexington, that they had construed similar provisions in their charters as giving the "surplus" and "expense" funds absolutely to the stockholders. This evidence was offered to prove a custom, it is said, as justifying appellant's like belief and construction. The trial judge, we think properly, refused to permit the testimony. As a matter of law, we decide that the company had not the right to appropriate these funds to themselves if the company was insolvent, or if such appropriation made it so. The belief or conduct of other people could not affect the matter. Appellant's belief and that of his co-directors, in acting in this case, was relevant, and was properly admitted. It was likewise proper that they should have been permitted to state the foundation of their belief— whether it was based upon advice of counsel, or their experience in other similar concerns, or whatever it may have been.

It is insisted for appellant that the Legislature has by statute, by sections 548, 550, Ky. St. 1899, fixed the whole responsibility of directors for wrongfully declaring dividends, and that they can not be otherwise punished for that act. Section 548, Ky. St. 1899, makes the directors of a corporation liable for all its debts if they should pay any dividends to stockholders while it is insolvent, or that would make it insolvent. This is a civil liability only, and does not

affect their responsibility for criminal acts. Section 550, Ky. St. 1899, provides a penalty, by way of fine, against directors who violate any of the provisions of the chapter on corporations. This section deals with those acts which are merely negligent, principally acts of omission or non-feasance; the failure to comply with certain features of the law, the observance of which it was believed tended to the surer protection of those interested in or dealing with the corporation, whether stockholders or creditors. It was not intended by this section to reduce the felonious act of embezzlement by the officers of a corporation to a mere misdemeanor. Besides, this prosecution is not for wrongfully declaring dividends when the condition of the company did not justify it, but it is for embezzlement committed under the guise of declaring a dividend.

The instructions to the jury did not submit the question of the fraudulent action of appellant's co-directors in declaring and paying the dividend. That was error, as is pointed out above.

The instructions permitted a conviction if appellant appropriated the money of the corporation "without right and fraudulently." The court failed to define to the jury what were the limitations of this "right" and the meaning of "fraudulent," thus making the jury judges of the law as well as of the facts. This was error. The jury should have been instructed that the directors had the right to declare the dividend in the event that the assets of the company remaining were sufficient to pay its liabilities, including those to the holders of outstanding membership certificates; that the directors had the right to reimburse themselves from the "expense fund" any sums actually advanced or paid out of their own money by them on behalf of the company to procure or extend its business; but the declaration and payment

of dividends, or the payment of alleged expenses otherwise, were without right in fact and in law.

In defining "fraudulent conversion" and "fraudulent intent," as used in the instructions, the court should have told the jury that "in this case by fraudulent conversion is meant  the deceitful, intentional appropriation of the property of the corporation, without right and without a belief of right as defined in these instructions; and a fraudulent intent is the intent to effect such appropriations."

The instructions, in all other particulars, in our opinion, fairly present the law of the case.

The judgment is reversed, and cause remanded, with directions to set aside the judgment and verdict, and to award appellant a new trial under proceedings not inconsistent herewith.