**Charles QUEEN, Appellant,**

**v.**

**COMMONWEALTH of Kentucky, Appellee.**

Court of Appeals of Kentucky.

Nov. 15, 1968.

Eugene Goss, Harlan, for appellant.

John Breckinridge, Atty. Gen., John B. Browning, Asst. Atty. Gen., Frankfort, for appellee.

CULLEN, Commissioner.

Charles Queen was convicted of fraud, deceit or misrepresentation in the sale of preorganizational stock certificates in a proposed corporation, in violation of KRS 292.320(1) (part of the Kentucky "Blue Sky" law), and his punishment was fixed at a fine of $5,000 and a jail sentence of six months, pursuant to KRS 292.991. Appealing, he raises numerous grounds of error, in several of which we find merit such as to require reversal.

The statute, KRS 292.320(1), is as follows:

"(1) It is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly:

"(a) To employ any device, scheme, or artifice to defraud;

"(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or

"(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."

The indictment paraphrased the statute and it embodied, by way of description of the *facts* constituting the offense, only the statements that the alleged fraud was "in connection with selling stock subscriptions," that the defendants (Queen and two others) misrepresented to various named individuals "their real purpose and intent for the sale of subscriptions for stocks," and "diverted the money into unauthorized enterprises, all contrary to their representations in obtaining the money."

The proof was that Queen was a principal stockholder in a holding company known as General Industries, which owned subsidiary corporations known as Old Shaker Quarry, Chemflo, and American Agency. Queen also was the sole owner of a corporation known as Kentucky Motor Sports, which had just been organized. The three corporations owned by General Industries were in bad financial shape, as a result of which General Industries too was in bad shape. Kentucky Motor Sports never had any substantial assets.

Queen conceived the idea of forming a new holding company, to be known as American Industrial Development Corporation. He also obtained in Ohio a *charter* for a proposed new life insurance company. He then engaged Joe Jemeley and Mack Jemeley to sell preorganization stock in the new holding company, representing to them that the "ultimate and main business for the company was to be the insurance business." The Jemeleys proceeded to sell the stock to a number of people in Bell County, Kentucky, representing to them that the primary purpose of the holding company would be to acquire a controlling interest in the proposed new insurance company and to get it in operation. The money received from the stock sales, amounting to $69,200, was all turned over to Queen.

Instead of using or holding the money for purchase of stock in the insurance company, Queen invested it in the three subsidiary corporations owned by General Industries, and in Kentucky Motor Sports. In turn he acquired stock in those corporations which he took in his name as "Trustee," intending, he said, to turn the stock over to the new holding company when its incorporation was completed. The money invested in the four corporations above mentioned did not save them from financial collapse, and their stock became worthless.

One of Queen's contentions on this appeal is that the evidence was not sufficient to sustain a conviction of fraud, deceit or misrepresentation on his part; that there was no showing that he diverted any of the money to his personal use or realized any money from the venture; that the wording of the stock subscription agree-

ments authorized him to invest in subsidiary corporations for the new holding company; and that Queen did not personally make any misrepresentations to the buyers of the stock.

■■■ It is our opinion that the evidence was sufficient to sustain the conviction. While Queen may have hoped that he could save the floundering subsidiary corporations of General Industries, and could save his own Kentucky Motor Sports, by investing the subscription money in them, and thereby their stock would become of value and inure to the benefit of the subscribers to the stock of the new holding company, the fact is that Queen personally stood to benefit by increase in the value of his personal holdings in General Industries and Kentucky Motor Sports if he could get them in a solvent condition. If he had invested in the insurance company, as represented he would do, the stock subscribers would all have come in with Queen on an equal basis, whereas the way it actually turned out the subscribers' money was used in an effort to pump up Queen's existing holdings. Furthermore, had all of the subscription money been invested in the new insurance company it well might have been a successful venture, whereas the actual dissipation of the money by Queen among the four existing, failing companies was unsuccessful. As far as concerns the wording of the subscription agreements, it does not mean, as we read it, that Queen could use the subscription money at his discretion to buy stock in such companies as he chose, prior to completion of the organization of the new holding company. And in any event, the wording would not prevail over positive oral representations as to what company the money would in fact be invested in. As concerns the question of whether Queen personally made any misrepresentations to the stock buyers, we consider that question to be immaterial, because Queen did misrepresent to the Jemeleys and they went out to the prospective buyers as his agents.

We come now to a group of contentions, which we consider to be related, having to do with alleged defects in the indictment, failure to furnish an adequate bill of particulars as ordered by the court, and errors in the instructions. In considering the questions raised we think it is essential to keep in mind that the statute in issue proscribes fraud, misrepresentation or deceit "in connection with the * * * sale * * * of any security." So the key act in an offense is the *sale* and the offense grows out of the conduct employed in the *sale*.

■■ The Commonwealth in the instant case, in the indictment, the bill of particulars, and the instructions, undertook to treat the *entire sale program or venture* in relation to the disposition of the preorganization stock in American Industrial Development Corporation as a single transaction or offense. It is our opinion that in this, prejudicial error resulted, and that properly each sale to a different buyer should have been charged as a separate offense in a separate count of the indictment, with a description of the *facts* constituting the elements of each offense (which probably would have made a bill of particulars unnecessary), and the instructions should have required a finding of the facts constituting the elements of each offense as charged in the indictment.

■■■ The question of when an act, transaction or course of conduct shall be considered to constitute multiple offenses rather than a single offense is one on which the law is unclear, and the answer to which may vary according to a varying legislative intent. See Commonwealth v. Colonial Stores, Incorporated, Ky., 350 S. W.2d 465. In some situations, such as in the Colonial Stores case, doubts will be resolved against turning a single transaction into multiple offenses, where serious prejudice to the accused might otherwise result. On the other hand, we can conceive of situations, and we believe the instant case presents one, in which to treat a course of

conduct as a single offense would operate to the prejudice of the accused.

In the instant case the course of conduct (selling the securities) extended over a period of months and involved numerous buyers, to each of whom the representations might have been different. In one respect to treat this entire course of action as one offense might redound to the benefit of the accused, in that he would be liable only to one punishment. However, it could operate to his detriment in allowing the cumulation of a series of separate seemingly insignificant violations to become magnified into an impression of serious misconduct resulting not only in the persuasion of the ·jury to return a finding of guilt, but in the imposition of a severe penalty. And perhaps more important is the fact, as illustrated in this case, that the accused is faced with a tremendous burden of preparing a defense when he does not know what phases of his course of conduct will be particularly attacked by the prosecution.

■ It is our opinion that the legislature in proscribing the use of fraud, deceit or misrepresentation "in connection with the * * * sale * * * of any security" intended that each separable sale transaction should constitute a separate offense, at least where the charged fraud, deceit or misrepresentation was made in each transaction as distinguished from being in the form of a general public advertisement or prospectus. Accordingly, the indictment in the instant case was defective in undertaking to charge the whole sale program as one offense. The indictment properly should have contained a separate count for each sale, RCr 6.18, and should have set forth in each count "a plain, concise and definite statement of the essential facts constituting" each offense, RCr 6.10. Since the terms of the statute do not themselves state the *acts* necessary to constitute the offense—do not describe the facts constituting the elements of the offense—it is not sufficient for the indictment merely to follow the words of the statute. See Com-

monwealth v. Fain, 248 Ky. 383, 58 S.W.2d 642; Kimbler v. Commonwealth, Ky., 269 S.W.2d 273.

With a proper indictment a bill of particulars probably will be unnecessary.

■ If the indictment sufficiently details the acts constituting each offense charged, and the facts constituting the elements of the offenses, it will be sufficient for the instructions to follow the language of the indictment. See Means v. Commonwealth, 256 Ky. 30, 75 S.W.2d 546. The important consideration is that the elements of the offense be stated to the jury rather than letting the jury decide for itself what constitutes fraud, deceit, etc. See Taylor v. Commonwealth, 119 Ky. 731, 75 S.W. 244.

■ The instructions given in the instant case were defective in not stating the elements of the offense charged and in not confining the finding of fraud, etc., to the facts in evidence. Also, they should have contained the word "wilfully" from KRS 292.991. Furthermore, no instruction on conspiracy should have been given because the evidence showed that the fraud was consummated so the conspiracy was merged in it. See Faison v. Commonwealth, Ky., 405 S.W.2d 943; 16 Am.Jur. 2nd, Conspiracy, sec. 6, p. 130. (The instruction on conspiracy that was given further was in error in authorizing the felony punishment and applying the felony limitation period prescribed by KRS 292.991, since a conspiracy to commit the crime here involved is a *misdemeanor*. See Commonwealth v. Donoghue, 250 Ky. 343, 63 S.W.2d 3, 89 A.L.R. 819.)

■ The appellant's contention that an indictment charging violation of KRS 292.-320 in the use of fraud, misrepresentation and deceit is duplicitous in that it charges three separate offenses (one for each subparagraph of KRS 292.320(1)) is without merit, because fraud, deceit and misrepresentation are merely methods by which the offense—a *sale* violating the statute—is

committed. Certainly a single sale cannot be broken down into three offenses by charging that it was made by fraud, by deceit, and by misrepresentation.

 The appellant argues that KRS 292.320 is so vague, ambiguous, indefinite and uncertain as not to constitute a valid basis for a criminal prosecution. A similar attack on the substantially identical provisions of the Federal Securities Act was rejected by a federal court in Coplin v. United States, 9 Cir., 88 F.2d 652, and we concur in the reasoning of that decision. See also Roberts v. United States, 6 Cir., 226 F.2d 464.

The remaining two grounds of error to be considered relate to the admission of evidence. Over objections by the defendant the Director of the Division of Securities of Kentucky was permitted to testify that a preorganization stock certificate or subscription is a "security" under Kentucky law; that such securities must be registered when more than 10 prospective buyers are to be contacted; that it is unlawful to sell an unregistered certificate when registration is required; that a person selling certain types of securities must have a license; that Queen did not have a license and a former license held by him had been revoked. All of this was improper. The question of whether a preorganization certificate is a "security" is a question of law on which the opinion of a witness was not competent. See Gibson v. Crawford, 259 Ky. 708, 83 S.W.2d 1; 31 Am.Jur.2d, Expert and Opinion Evidence, sec. 69, pp. 579, 580. Furthermore, there was no occasion for such an opinion because the statute, KRS 292.310(11) plainly says that a preorganization certificate or subscription is a "security." All of the other testimony objected to was irrelevant because Queen was not charged with selling unregistered securities or with selling securities without a license.

The trial court permitted the introduction in evidence of a letter from the person who was chosen as secretary of American Industrial Development Corporation after its final organization, to a stockholder of General Industries, stating that because stock in General Industries was worthless the new corporation would not honor a subscription that the addressee of the letter had made for exchange of General Industries stock for stock in the new corporation. This letter was rank hearsay and should not have been admitted.

The judgment is reversed with directions for further proceedings in conformity with this opinion.

All concur.