**Earl L. BOGGESS, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

Court of Appeals of Kentucky.

Nov. 7, 1969.

Thomas F. Marshall, Frankfort, Henry Jack Wilson, Mayfield, for appellant.

John B. Breckinridge, Atty. Gen., Frankfort, John B. Browning, Asst. Atty. Gen., Frankfort, for appellee.

REED, Judge.

The appellant, Earl Boggess, and Charles Willis were indicted jointly for an alleged violation of KRS 292.320(1) (c) which is part of the Kentucky "Blue Sky" law. Willis was not apprehended and Boggess alone was tried. His trial resulted in a jury verdict which found him guilty and fixed his punishment at a fine of $5,000 and a jail sentence of one year. (KRS 292.991). Boggess appeals from the judgment entered pursuant to this verdict. He asserts that the indictment returned against him failed to state a public offense; that he was entitled to a directed verdict of acquittal; that the verdict returned is not sustained by the evidence; and that the lower court failed to properly instruct the

jury. We have concluded that the prosecution's evidence was insufficient to permit submission to the jury of the issue of appellant's guilt of the offense charged in the indictment and that appellant was entitled to a directed verdict of acquittal. We, therefore, reverse the judgment of conviction.

The evidence adduced at the trial included proof of circumstances that are irrelevant to the disposition of this appeal. For the sake of brevity, we will state that we are convinced that the prosecution's evidence sufficiently established that Boggess was a coprincipal with Willis in the transactions which gave rise to the indictment. Hence, we will omit recitation of that portion of the evidence introduced to establish that element of the alleged offense.

Boggess and two other business associates formed a corporation in April, 1964 The corporate name was "Insurance Group, Inc." The purpose of this entity was to find and purchase existing operating insurance companies. Willis was not one of the incorporators, but he loaned Boggess money which Boggess, in turn. used to pay in to the new corporation as part of a stock subscription. Boggess paid cash, executed and delivered to the corporation his promissory note, and rendered services in consideration of all of which he was issued 34,500 shares of common stock. Boggess was a director of the new corporation and served as its secretary. The corporation promptly made application to the director of securities of the State Banking Department for authorization to sell to Kentucky residents 247,000 shares of common stock at $5 a share in order to raise about $1,000,000 in capital after deducting expenses of sale. The proceeds of sale of the public issue were deposited in a bank which acted as escrow agent. The purchasers of the public issue were protected by the requirement that the escrow agent was bound to hold these proceeds until sale of the public issue was completed; it was further required that the public issue be sold in full by December 15, 1965,

and in the event of failure to do so the escrow agent was directed to refund to each purchaser of the public issue stock the purchase price less a deduction of 15 percent for expenses of sale. Under KRS 292.-380(2), another section of the "Blue Sky" law, the securities director required Boggess to deliver his 34,500 shares of promotional stock into the custody of the Department of Banking to be held in escrow under an agreement that had the effect of protecting the potential purchasers of the proposed public issue. This promotional stock escrow agreement provided that the owner of this stock would not be entitled to sell, transfer, or withdraw it from escrow until all other stockholders (the purchasers of the public issue) had been paid a dividend or dividends aggregating not less than 6 percent of the initial offering price. The source of this dividend was required to be approved by the securities director as actual earnings on the common stock investment; this agreement further provided that in case of dissolution or insolvency during the time the promotional stock was held in escrow, the owners of the promotional stock could not participate in the assets of the corporation until after the owners of all other securities had been paid in full.

While this application for authority to sell the public issue, of which the promotional stock escrow agreement was a part, was filed and pending, and, more particularly, in August of 1964, Willis approached the prosecuting witness, Keeling, and offered to get Keeling "in on the ground floor" of a "good deal." Willis told Keeling he could get him in for $3 a share for the common stock; that the public would be charged $5 a share for the common stock; Keeling paid Willis $1500 for 500 shares.

On December 15, 1964, the securities director approved the sale of the public issue to be completed by December 15, 1965. Boggess thereupon assigned to Willis 10,-135 shares of his promotional stock, subject to its release by the Department of

Banking. According to Boggess this assignment was to secure his preexisting loan from Willis.

Meanwhile, Keeling had apparently had no further contact with Willis. In the early part of 1965, Keeling received from Willis an assignment of 500 shares of the stock Boggess had assigned to Willis. The assignment to Keeling recited the payment of $1500 to Willis. In this assignment Willis promised and agreed that "upon release of the said stock from escrow with the Department of Banking on demand of Keeling", Willis would "execute and deliver to Keeling such further instruments as may be necessary to vest legal title to said shares" in Keeling. The assignment from Boggess to Willis was explicitly mentioned in the assignment from Willis to Keeling. At the foot of the assignment to Keeling, there was a recitation that the corporation acknowledged receipt of and accepted the assignment and would perform the obligations of the instrument; this recitation was executed on behalf of the corporation by Boggess as corporate secretary. Keeling also received a letter from Boggess as corporate secretary. This letter stated that Willis had advised Boggess of the arrangements with Keeling. Keeling was thanked for his "assistance to Willis" and for his interest in the new corporation.

At least by the late summer of 1965, it became apparent that the public issue was fatally floundering and would not be sold out successfully. It appears that desperate efforts were made to bail the venture out by attempted arrangements to procure its acquisition by another going corporation on a stock exchange basis. Keeling was advised of these efforts by an attorney for the corporation in early 1966. Only about $164,000 was realized from sales of the public issue within the period prescribed by the offering. The purchasers of the public issue were refunded 85 percent of their investment. The director of securities retained the promotional stock in escrow. There was no money left to distribute to the owners of the promotional stock nor to

their assignees. Boggess and Willis were indicted.

At the trial other individuals who had dealt with Willis in the "ground floor" deal to their sorrow testified. Two instances were introduced where Boggess had assigned other shares of his promotional stock directly to individuals. This evidence was introduced to show motive, intent, and to demonstrate a common scheme or design.

KRS 292.320(1) says:

"(1) It is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly:

\*       \*       \*       \*       \*       \*

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."

KRS 292.991 provides a criminal penalty for any person who "willfully" violates KRS 292.320.

The indictment charges that Willis and Boggess violated KRS 292.320(1) (c) by "unlawfully, in connection with the offer and sale of Five Hundred (500) shares of stock of Insurance Group, Inc., to Rudy Keeling, engaged in an act, practice and course of business which operated as a fraud and deceit upon said Rudy Keeling, by obtaining $1500 from him and selling him said stock which they could not do because said stock was in escrow with the Department of Banking of the Commonwealth of Kentucky and could not be sold, \*  \*  \*."

Boggess asserts that the indictment does not charge the commission of a public offense; therefore, he argues that although he did not question the sufficiency of the indictment in the trial court, he is free to attack it on appeal. We reject that contention.

■ The indictment not only recited the words of the statute, it also specified a

particular transaction. While it omitted the word "willfully" and failed to define particularly the fraud and deceit, it did apprise Boggess of the nature of the charge and he was able to prepare his defense. Cf. Queen v. Commonwealth, Ky., 434 S. W.2d 318, and Commonwealth v. Allen, Ky., 441 S.W.2d 424. The indictment charged the commission of a public offense, although defectively. The defectiveness cannot be raised for the first time on appeal. Cf. Strunk v. Commonwealth, 302 Ky. 464, 194 S.W.2d 1002.

■ The Commonwealth in a very able brief admits with commendable candor that violation of the promotional stock escrow agreement is not subject to criminal penalty under the "Blue Sky" law and does not appear to be a separate offense. The case for the prosecution hinges upon the validity of the contention in its brief that "the members of the public to whom this stock was sold thought they were buying regular common stock in the corporation and that when they gave their checks in payment they then occupied the same status as any of the purchasers of the public stock isue." While this statement is appealing, the cold fact remains that Boggess and Willis were indicted and Boggess was tried for committing a criminal act of fraud and deceit upon Rudy Keeling. The case against Boggess depends upon the sufficiency of the evidence to afford any basis to infer that Willis was guilty of fraud and deceit in his transactions with Keeling. That evidence is entirely absent.

Keeling's testimony regarding any misrepresentation, fraudulent concealment or failure to inform on the part of Willis is, in substance, as follows:

"Q 38. Did he tell you that he was selling you the stock of the corporation that was being offered to the public or stock that he owned? Did he tell? Which did he say to you?

A. I don't remember which one he said."

At another point in his testimony, we find the following:

"Q 46. All right, now, this piece of paper signed by Mr. Willis, Charles William Willis, and he says in there, 'I, Charles William Willis, of Farmington, Kentucky, for value received, do hereby bargain, sell, assign and transfer unto Rudy Keeling of Route 3, Paducah, Kentucky, Five Hundred (500) shares of common capital stock of Insurance Group, Inc., with its principal place of business at Versailles, Kentucky.' Now you understand that all right, don't you, Mr. Keeling?

A. Yes, yes.

Q 47. 'and I further promise and agree that upon release of the said stock from escrow with the Department of Banking of the Commonwealth of Kentucky, on demand of the said Rudy Keeling, I will execute and deliver such further instruments as may be necessary to vest in him legal title to said shares; and I do hereby constitute and appoint the Secretary of Insurance Group, Inc., my lawful attorney, irrevocably for me, in my name, place and stead, to transfer the said shares on the books of the corporation.'

Now, you read this document and you understood that language, didn't you, Mr. Keeling?

A. Yes.

Q 48. No question in the world about it. Your agreement with Mr. Willis was then that when this stock was released from escrow you would make demand upon him and he would have the stock certificate issued to you. Isn't that your agreement?

A. Yes, sir.

Q 49. Have you ever made that demand upon Mr. Willis?

A. Have I ever made that demand to Mr. Willis?

Q 50. Yes.

A. I don't remember whether I did or not.

Q 51. Well, now you certainly have some recollection if you had talked to Mr. Willis and made demand upon him for your stock certificate, wouldn't you?

A. Well, I'm trying to think what did happen right there. I just don't remember now just what I did say.

Q 52. Well, you would have remebered if you had made demand upon him, wouldn't you?

A. Well, I think I would. Yes.

Q 53. Sure.

Now do you know whether as a matter of fact this stock has ever been released from escrow by the Department of Banking of the Commonwealth of Kentucky?

A. No, I don't know.

Q 54. You don't know that do you? You don't know right now if you made demand on Mr. Willis if he would perform his contract with you or not, do you Mr. Keeling?

A. Now, say that again.

Q 55. You don't know whether or not at this very moment if you made demand upon Mr. Willis he would perform the terms of this contract or not, do you?

A. No sir, I don't."

The statute which Boggess is accused of violating is a verbatim copy of Rule 10b-5 of the federal Securities and Exchange Commission (17 CFR, Sec. 240) which was promulgated to prevent manipulative or deceptive devices in sales and purchases of securities. This rule has been the subject of many recent federal decisions. It has been the basis for civil actions by investors against corporate insiders to recover for misrepresentation or concealment in situations involving the securities of going corporations—both closely held and publicly traded. See annotations in 7 A.L.R.3d 500 and 22 A.L.R.3d 793.

In other state jurisdictions the provisions of S. E. C. Rule 10b-5 have been adopted as part of the state "Blue Sky" law. For example, see Curtis v. State, 102 Ga.App. 790, 118 S.E.2d 264, for a discussion of that court's interpretation in a criminal case of the same provision contained in Rule 10b-5 and KRS 292.320(1) (c). An interesting collection of state "Blue Sky" law cases both civil and criminal is found at 87 A.L.R. 42.

In Queen v. Commonwealth, Ky., 434 S. W.2d 318, in considering KRS 292.320 in its entirety, we observed that: "The key act in an offense is the *sale* and the offense grows out of *the conduct employed* in the *sale*." Our research discloses that in every case either civil or criminal arising under the language of Rule 10b-5 itself or as incorporated in "Blue Sky" laws the essential element of the offense is either an affirmative misrepresentation or a concealment of material facts or silence *amounting to fraud.*

In the instant case there is no evidence whatever that Willis made an affirmative misrepresentation to Keeling, or that he concealed any fact—material or otherwise —or that he remained silent when he had a duty to disclose. The law accomplished the protection of the purchasers of the public issue. In a civil case involving an alleged violation of Rule 10b-5, the federal Circuit Court of Appeals for the Second Circuit pointed out that the aim of Rule 10b-5 was to qualify, as between corporate insiders and outsiders, the doctrine of caveat emptor—not to establish a scheme of investor's insurance. List v. Fashion Park, 340 F.2d 457, 22 A.L.R.3d 782. Certainly the standard to determine the extent of evidence necessary to permit an inference of fraud or deceit cannot be less stringent in a criminal action than in a civil action involving the same transaction and rule of conduct.

 

Was Keeling the victim of fraud or deceit practiced by Willis, or was this a situation where two men with full knowledge and opportunity for knowledge engaged in a transaction whereby one purchased from the other the right to take a considerable risk to possibly realize a reward much greater than in prospect for the purchasers of the public issue in the event the corporate venture was successful? The prosecution's evidence is silent in this respect and the gap cannot be supplied by evidence of other transactions with other people at other times which go only to establish design and state of mind—not the essential ingredients of the offense. Boggess was entitled to a directed verdict of acquittal. We need not discuss the instructions.

The judgment is reversed for further proceedings consistent herewith.

All concur.