# Commonwealth v. Donoghue.

(Decided June 23, 1933.)

BAILEY P. WOOTTON, Attorney General, FRANCIS M. BURKE, Assistant Attorney General, ULIE J. HOWARD and DANIEL W. DAVIES for appellant.

CHAS. E. LESTER, Jr., for appellee.

J. P. HAMILTON, H. T. LIVELY, ASHBY M. WARREN, J. J. DONOHUE, ANNA H. SETTLE, FRANK S. GRAYDON, MAXWELL & RAMSEY and LESLIE W. MORRIS amici curiæ.

OPINION OF THE COURT BY STANLEY, COMMISSIONER— Reversing.

The opinion deals with the sufficiency of an indictment charging the common-law offense of conspiracy, and relates to what are popularly referred to by the invidious and iniquitous term of "loan sharks". The case is an echo of Goodenough, Judge, v. Kentucky Purchasing Company, 241 Ky. 744, 45 S. W. (2d) 451. We shall abridge the indictment by omitting terms and words usually regarded as essential to technical sufficiency. The instrument charges M. Donoghue, W. T. Day, and Vernon L. Buckman with the offense of criminal conspiracy, committed as follows: That they unlawfully and corruptly conspired with one another and others, to the grand jury unknown, "to engage in the business of lending money in small amounts to poor and necessitous wage earners at excessive, exorbitant and usurious rates of interest and to prevent the recovery of such interest paid by said borrowers"; that while the conspiracy existed and in pursuance and furtherance thereof they "operated a money-lending business under the trade name of Boone Loan Company, with its office in Kenton County, Kentucky"; that the accused or one or more of them, with the advice, consent, and acquiescence of the others, acting in concert and in furtherance of the conspiracy and in the operation of the business, did lend to hundreds of poor and necessitous wage-earners small sums of money in amounts ranging from $5 to $50, at high, excessive, exorbitant, illegal, and usurious rates of interest, to wit, from 240 to 360 per cent. per annum. It was further alleged that "for the purpose of effecting the object of said conspiracy, as hereinbefore charged," the accused filed in the county court clerk's office false and fraudulent certificates pretending to set forth the true and real owner of the business, but which in fact did not do so; that in furtherance of the conspiracy and to effect its purposes, they failed to file a true statement revealing the real owners of such business with the post office address of such owner; and that in furtherance of the conspiracy and to effect its objects they operated the business while the "same was the property and part of a foreign corpora-

tion, without having theretofore filed in the office of the Secretary of State" a certificate giving the location of its .offices in the state and the name of a process agent. Only Donoghue was before the court. The trial court sustained a demurrer to the indictment and dismissed it. The commonwealth has appealed.

1. Notwithstanding the many declarations of this court and the universal recognition by all authorities, the appellee raises the question whether the common-law offense of conspiracy exists in Kentucky, or rather whether that offense had developed in the fourth year of the reign of James I. of England so as to cover the substantive things described in this indictment. The principles and rules constituting a part of the common law prior to the time stated, which was March 24, 1607, that were of a general nature and not local to the kingdom are and have ever been in force in Kentucky except as they have been modified by constitutional and statutory law, judicial decisions and the conditions and wants of the people, or which are not repugnant to the spirit of our laws or the public policy of the state. That common law is of equal authority and binding force with the statute law. Section 233, Kentucky Constitution; Lathrop v. Bank, 8 Dana, 114, 121, 33 Am. Dec. 481; Ray v. Sweeney, 14 Bush, 2, 29 Am. Rep. 388; Ætna Insurance Company v. Commonwealth, 106 Ky. 864, 51 S. W. 624, 627, 21 Ky. Law Rep. 503, 45 L. R. A. 355; Nider v. Commonwealth, 140 Ky. 684, 131 S. W. 1024, Ann. Cas. 1913E, 1246; Coleman, Auditor v. Reamer's Executor, 237 Ky. 603, 36 S. W. (2d) 22, 23. The claim that in the year 1607 there was no common-law conspiracy comprehending the acts described in the indictment is based upon the quotation of a work on criminal conspiracies in Ætna Insurance Company v. Commonwealth, supra, to the effect that there is no evidence that during the period of 1200 to 1600 there was any other crime of conspiracy than that finally defined by ordinance in 1305, A. D. The question in that case was whether the charges made against a number of insurance companies to maintain fire insurance rates constitute a common-law offense of conspiracy, and the excerpt was quoted as indicating that those particular things did not constitute such an offense and were unknown to the common law. But the case was decided upon the ground that neither the end

nor the means of the combination complained of was unlawful. As we understand counsel's argument before us it is that the essence of this accusation is of a similar character, that is, a conspiracy in restraint of trade, or, at most, a conspiracy to charge usury. We do not so regard it. Whatever the particular classification one may desire to place the charges in, all of the legal historians and authorities treat conspiracy as embracing acts of the same general nature. And so has this court regarded them. Commonwealth v. Barnett, 196 Ky. 731, 245 S. W. 874; Baker v. Commonwealth, 204 Ky. 420, 264 S. W. 1069. The historical narrative to follow shows that the extreme condemnation of the business of the usurer during the period of the development of the common law is sufficient to make it a subject of indictable conspiracy. The recent and most authoritative writers declare as inaccurate the statements that the word "conspiracy" had a different meaning anciently than in more recent times, and the comprehensiveness and meaning of the term or its principles existed in early times as now. State v. Buchanan, 5 Har. & J. (Md.) 317, 9 Am. Dec. 534; 12 C. J. 542; 5 R. C. L. 1062.

2. Is it sufficient to charge in the accusatory of the indictment merely the offense of "criminal conspiracy," or should the accusation be more specific and contain the object or purpose of the conspiracy? The general use of the term in the books, both ancient and modern, is simply "conspiracy"; but, since there may be a civil liability for an unlawful conspiracy, it is frequently called "criminal conspiracy" as a distinctive title. The accepted definition of conspiracy is that it is an unlawful agreement for the accomplishment of many purposes, as will be discussed later. The combination is not only the gravamen but it is the offense itself. The designation is but a generic term, such as is "arson" a general title of an offense to burn property, and it is regarded as sufficient as an accusation. The recent interpretation of our statutory crime of conspiracy, as it is often popularly called, does not militate against this view. The statute (Ky. Stats. sec. 1223) provides that if two or more persons shall "confederate or band themselves together" for certain specified purposes, "or to do any felonious act" they commit a felony. This is altogether different from the common law of

conspiracy, which is a misdemeanor even though its object be a felony. Wait v. Commonwealth, 113 Ky. 821, 69 S. W. 697, 24 Ky. Law Rep. 604. The statute did not repeal the common-law offense except as to the particular acts covered. Commonwealth v. Barnett, supra. It has been held not sufficient under the statute merely to chage "confederating" or "unlawfully banding and confederating together" without designation, even though the descriptive portion of the indictment fully defines the objects to be within the stipulations and purview of the statute. Deaton & Boggs v. Commonwealth, 220 Ky. 343, 295 S. W. 167; Grise v. Commonwealth, 245 Ky. 220, 53 S. W. (2d) 362. But it is sufficient to charge "confederating and banding themselves together for the purpose of doing a felonious act," for that is the statutory crime, and it is not necessary to state in the accusatory what that felonious act was. Harr v. Commonwealth, 245 Ky. 278, 53 S. W. (2d) 575. We are of the opinion, therefore, that in this respect the indictment was sufficient.

3. The comprehensiveness and indefiniteness of the offense of conspiracy has made an exact definition a very difficult one, as has been often stated. But the broad definition or description everywhere accepted is that conspiracy is a combination between two or more persons to do or accomplish a criminal or unlawful act, or to do a lawful act by criminal or unlawful means. Wharton's Criminal Law, sec. 1600; Brill's Cyclopedia of Law, sec. 482; 12 C. J. 540; 5 R. C. L. 1061; Sparks v. Commonwealth, 89 Ky. 645, 20 S. W. 167; Commonwealth v. Walters, 206 Ky. 162, 266 S. W. 1066; Myers v. Commonwealth, 210 Ky. 373, 275 S. W. 883. In the elaborate treatment of the subject in Ætna Insurance Company v. Commonwealth, supra, the following was taken from the American and English Encyclopedia of Law and approved:

" 'A criminal conspiracy is (1) a corrupt combination (2) of two or more persons, (3) by concerted action to commit (4) a criminal or an unlawful act; (a) or an act not in itself criminal or unlawful, by criminal or unlawful means; (b) or an act which would tend to prejudice the public in general, to subvert justice, disturb the peace, injure public trade, affect public health, or violate public policy; (5) or any act, however innocent,

by means neither criminal nor unlawful, where the tendency of the object sought would be to wrongfully coerce or oppress either the public or an individual. * * * It is the corrupt agreeing together of two or more persons to do, by concerted action, something unlawful, either as a means or an end, that constitutes a criminal conspiracy. The unlawful thing must either be such as would be indictable if performed by one alone, or of a nature particularly adapted to injure the public or some individual by reason of the combination. It is not necessary, in order to constitute a conspiracy, that the acts agreed to be done should be acts which, if done, would be criminal. It is enough that they are wrongful; that is, amount to a civil wrong. * * *

" 'Every conspiracy to do an unlawful act, or to do a lawful act for an illegal, fraudulent, malicious, or corrupt purpose, or for a purpose which has a tendency to prejudice the public in general, is an indictable offense, regardless of the means whereby it is to be accomplished.' "

It is further said in 6 Am. & Eng. Encyl. of Law, 850, under the title, "Design Opposed to Right and Justice Merely" that:

"In this sense a conspiracy may consist of a combination to do what is merely unlawful or, in other words, opposed to principles of right and justice, as contradistinguished from that which is criminal or for doing of which the law prescribes punishment."

See, also, 2 Bishop's New Criminal Law, sec. 171.

According to the overwhelming weight of authority the objects of the conspiracy need not be an offense against the criminal law for which an individual could be indicted or convicted, but it is sufficient if the purpose be unlawful. That term "unlawful" in this connection has been expanded beyond its original limits of being only some act punishable as a crime. It is now understood and regarded as covering an act not embraced in the crime of conspiracy as it originally existed. It cannot be said, however—and care must ever be exercised in the application, as all courts recognize—that the term "unlawful" includes every act which violates legal rights of another or such as may create a

right of action. Smith v. People, 25 Ill. 17, 76 Am. Dec. 780; Commonwealth v. Hunt, 4 Metc. (Mass.) 111, 38 Am. Dec. 346. The sound attitude to be taken in the premises seems to be as thus well stated in 5 R. C. L. 1069:

"The proper rule undoubtedly is that all such acts as have the necessary tendency to prejudice the public or to injure or oppress individuals by unjustly subjecting them to the power of the conspirators are sufficiently tainted with the quality of the unlawfulness to satisfy the requirements as to conspiracy. It is said that the influence of the act or purpose upon society determines whether a combination to accomplish it is a criminal conspiracy. Purposes or acts which are unlawful, as violative of the rights of individuals, and for which the law will afford a civil remedy to the injured party, and will at the same time and by the same process punish the offender for the wrong and outrage done to society by giving exemplary damages beyond the damages actually proved, have in numerous instances been held to be of the quality needed to convert the combination for accomplishing them into a conspiracy."

A more specific distinction is noted by Wharton in sections 1626, etc. of his work on criminal law. There is a series of acts which have the essence but not the form of crime, (e. g. immoral acts, undictable cheats) which, wanting the necessary objective constituents, escape judicial cognizance as being intrinsically criminal, but which are held to be invested by conspiracy with a garb that exposes them to the penalties of the law. Without the combination of men attempting to accomplish the objects they had only the essence of crime, but by means of the conspiracy an unfair and mischievous advantage of the aggressors is recognized and the acts are presented in such definiteness that they can be taken hold of and punished. Of this character is a conspiracy to use violence, as a riot, which derives its indictability from the plurality of persons concerned and to a conspiracy to injuriously affect the body politic. Another series of acts which become cognizable by reason of the plurality of men or union of forces are those which prejudice the public or the government generally, such as unduly elevating or depressing

wages, the price of the necessities of life, or impoverishing a class of individuals. The gist of conspiracies of this class is the unlawfulness of the means used.

So it may be said that within the contemplation of the offense of criminal conspiracy are the acts which by reason of the combination have a tendency to injure the public, to violate public policy, or to injure, oppress, or wrongfully prejudice individuals collectively or the public generally. Commonwealth v. Ward, 92 Ky. 159, 17 S. W. 283, 13 Ky. Law Rep. 422; Roberson's Kentucky Criminal Law, sec. 210; 1 Hawkins Pleas to the Crown, ch. 72; 3 Chitty, Criminal Law, 1139; 2 Bishop's Criminal Law, sec. 172; Brill's Cycl. of Criminal Law, secs. 489, 494, 495; 5 R. C. L. 1065.

One of the main objects of the law governing criminal conspiracies is to protect the community at large, and the protection of individuals is subordinate to that end. State v. Cardoza, 11 S. C. 195; Roberson's Criminal Law, sec. 217. In section 23 of Brill's Cycl. of Criminal Law, it is written:

"It may be laid down as a general rule of the common law that any act or any omission of a legal duty that injures or tended to injure the community at large to such an extent that public policy requires the state to interfere and punish the wrongdoer is a crime and renders the wrongdoer liable to indictment. And this is true although no exact precedent for punishing the particular act in question can be found."

With this abstract understanding as to what may be the subject-matter of a criminal conspiracy, we may direct our consideration to the subject of usurious demands and collections.

Now, the occupation of a usurer has been bitterly denounced in all ages of the civilized world, and in most Christian countries there have been laws to suppress it. The implications and inferences to be drawn from the indictment, coupled with general knowledge of the rapaciousness, the audacious and unconscionable practices of this class of usurious money lenders to be found in every city, suggest the application of the following extravagant phillippic of St. Basil, one of the most learned theologians and illustrious orators of the early Christian church, spoken in the fourth century:

"The griping usurer sees, unmoved, his necessitous borrower at his feet, condescending to every humiliation, professing everything that is villifying; he feels no compassion for his fellow-creatures; though reduced to this abject state of supplication, he yields not to his humble prayer; he is inexorable to his entreaties; he melts not at his tears; he swears and protests that he has no money, and that he is under necessity of borrowing himself; he acquires credit to his lies by superadding an oath, and aggravates his inhuman and iniquitous traffic with the grossest perjury. But when the wretched supplicant enters upon the terms of the loan, his countenance is changed; he smiles with complacency; he reminds him of his intimacy with his father, and treats him with the most flattering cordiality. 'Let me see,' says he, 'if I have not some little cash in store, for I ought to have some belonging to a friend who lent it to me on very hard terms, to whom I pay most exorbitant interest for it; but I shall not demand anything like that from you'. By fair words and promises, he seduces and completely entangles him in his snares; he then gets his hand to paper and completes his wretchedness. How so? By dismissing him bereft of liberty."

During the time of Elizabeth the subject of usurious interest was frequently discussed. Lord Bacon in one of his essays examined the arguments pro and con, in which he says:

"Many have made witty invectives against usury. They say that it is pity the devil should have God's part, which is the tithe; that the usurer is the greatest Sabbath breaker, because his plow goeth every Sunday; that the usurer is the drone that Virgil speaketh of: Ignavum fucos pecus a praesepibus arcent; that the usurer breaketh the first law that was made for mankind after the fall, which was, in sudore vultus tui comedes panen tuum; that usurers should have orangetawny bonnets, because they do Judaize; that it is against nature for money to beget money, and the like. * * * Few have spoken of usury usefully."

He then opens up the "incommodities" and "commodities" of usury, and concludes that by "the balance

of commodities and discommodities of usury, two things are to be reconciled; the one, that the tooth of usury be grinded, that it bite not too much; the other, that there be left open a means to invite moneyed men to lend to the merchants, for the continuing and quickening of trade." And finally he says "that is better to mitigate usury by declaration than to suffer it to rage by connivance." (Bac. Essays, Civ. and Mor., No. 41.)

The celebrated opinion of Chancellor Kent, delivered in 1819, in Dunham v. Gould, 16 Johns. (N. Y.) 367, 8 Am. Dec. 323, is an exhaustive historical treatise of the subject. We are there informed that:

"The Romans, through the greater part of their history, had the deepest abhorrence of usury. They did not derive their objection to usury from the prohibitions in the Mosaic law, nor did they hold it sinful, as the learned Fathers of the early and middle ages of the church have done, for they knew nothing of that law. The Roman lawgivers and jurists acted from views of public policy. They found, by their own experience, that unlimited usury led to unlimited oppression, and that the extortion of the creditor, and the resistance of the debtor, were constantly agitating and disturbing the public peace. But it is not only the civilized and commercial nations of modern Europe, and the sage lawgivers of ancient Rome, that have regulated the interest of money. It will be deemed a little singular, that the same voice against usury should have been raised in the laws of China, in the Hindu Institutes of Menu, in the Koran of Mahomet, and perhaps, we may say, in the laws of all nations that we know of, whether Greek or Barbarian."

It is not uncommon for the opinions to refer to the Bible prohibition of usury and its condemnation by the Mosaic law. Leviticus, 25: 35-37; Deuteronomy, 23: 19. Some have misinterpreted the word as there used and inaccurately regarded usury as only exorbitant interest. The theologians and Bible students understand it to have been any interest or rent of money—that it was against the tribal law to collect anything by way of compensation for the lending of money or any other thing to members of the tribes of Israel or fellow Hebrews, although permitted as against aliens.

The origin and development of our laws of interest and usury are veiled in obscurity before the first English enactment regulating the rate, which was the statute of 37 Henry VIII., ch. 9 (1545, A. D.). It limited interest to 10 per cent. per annum and made it a penal offense to take more. In the following reign that law was repealed by the statute of 5 & 6, Edward VI., ch. 20 (1555), which absolutely prohibited the taking of any interest whatever on pain of forfeiting the entire debt. But public opinion soon proved too enlightened for such legislation, and it was repealed by statute of 13 Elizabeth, ch. 8 (1570), and the rate of interest authorized by the statute of Henry VIII., was restored. The rate was reduced to 8 per cent. by the statute of 21 James I., ch. 17, and later to 6 per cent. by the statute of Charles II., ch. 13. Finally, by the statute of 12 Anne. ch. 16 (1714), commonly known as the "statute of usury," the rate of interest was established at 5 per cent. per annum. This is the prototype of all legislation in this country. It declared void any contract calling for interest in excess of 5 per cent. and provided that the receiver should forfeit treble the value of "the Monies, Wares, Merchandizes and other Things so lent." 29 Am. & Eng. Enc. of Law, 454; 30 Cyc. 890; note to 33 C. J. 180.

It is related in Gray v. Bennett, 3 Metc. (44 Mass.) 522, Schlesinger v. State, 195 Wis. 366, 218 N. W. 440, 57 A. L. R. 352, and our recent opinion of Coleman, Auditor, v. Reamer's Executor, supra, as well as in many other authorities:

"Usury was an offense at the common law, and the usurer was not only punished by the censures of the church in his lifetime, but was denied a christian burial; and by the laws of Alfred the Great, and Edward the Confessor, if, after death, even, a man was found to have been a usurer, his goods were forfeited to the crown, and his lands to the lord of the fee."

However, legal historians are not in harmony as to whether the taking of usury was an indictable offense at ancient common law. It is now punishable by statute in England and in many states in this country, the laws being sustained as within the police power.

Time and space forbid further travel in this alluring path of general history. It suffices to say that the

business of the usurer has always called for vigorous condemnation and has ever been regarded as against public welfare and public policy.

The first usury statute in Kentucky, enacted in 1796, was that any one who took more than the rate or value of five shillings for the "loan or forbearance of one hundred pounds for a year * * * shall forfeit for every offense twenty pounds to the Commonwealth and informer, to be recovered and divided, as herein before mentioned." In 1798 the rate was changed to "six pounds for the forbearance of one hundred pounds for a year" or proportionate sum or term. All instruments or assurances calling for the payment of money or goods lent at a higher rate were declared void and the lender could not collect anything on the obligation; but, peculiarly, if the borrower undertook to secure relief from his contract, he was compelled to pay the principal. (2 Littell's Digest of Statute Laws, p. 1225.) Morrison v. Helm, 7 Ky. (4 Bibb) 460; Outen v. Graves, 30 Ky. (7 J. J. Marsh.) 629, 630. In 1819 it was enacted that only as to the interest in excess of 6 per cent. should the contract be void. 2 Littell's Digest of Statute Laws, 1226. The law has been substantially the same since that time. Our current Statutes (sections 2218, 2219) merely declare that the portions of contracts calling for payment of interest in excess of 6 per cent. are void, authorize the recovery of the excess, and require the lender in an action to avoid payment to bear the entire costs of the proceeding. No subterfuge, device, or trick will be permitted to avoid this law. Williams v. Eagle Bank, 172 Ky. 541, 189 S. W. 883. While in a degree this penalizes the usurer, the statute is remedial and cannot be regarded as making the act a criminal offense.

Turning our attention again to the indictment now before us. It is *much more* than merely a charge that the accused conspired to collect usury. The accusation is a conspiracy to carry on the business of lending money in small amounts from $5 to $50, to poor and necessitous wage-earners at rates of interest ranging from 240 to 360 per cent. per annum, and then to prevent the recovery of the usury paid by such borrowers. Two means of preventing that recovery are alleged, both of which are violations of the statutory laws of this state: (1) By operating under a fictitious name

without filing a statement of the true name of the real owners of the business and their post office address as required by section 199b-1 of the Statutes, a violation of which is declared to be a misdemeanor and punishable by fine or imprisonment or both; and (2) that the business which the defendants were so conducting was the property and a part of a foreign corporation which had not complied with the Constitution and statutes of the state under which a foreign corporation is authorized to carry on business in Kentucky.

The indictment does not charge the accused with the mere exaction of usury, or of isolated instances of collecting slight excesses over the legal rate of interest. The objects of the conspiracy were not incidents to a legitimate business. If that were all, it might be doubted whether it could be regarded as an offense or an unlawful act within the meaning of that term in its relation to conspiracy. It charges *a nefarious plan for the habitual exaction of gross usury,* that is, in essence, the operation of the business of extortion. The import of the indictment is to charge systematic preying upon poor persons, of taking an unconscionable advantage of their needy conditions, of oppressing them, of extorting money from them through the disguise of interest, and, as an intrinsic part of the plan, to prevent restitution by obstructing public justice and the administration of the law. If ever there was a violation of public policy as reflected by the statutes and public conscience, or a combination opposed to the common weal, it is that sort of illegitimate business. It was extortioners of this class, called money changers, whom the Christ drove from the Temple on two occasions.

In State v. McMahon, 128 Kan. 772, 280 P. 906, 66 A. L. R. 1072, the Supreme Court of Kansas held to be good a petition of the state on relation of its Attorney General seeking "to stamp out the business of usurers who prey on the poorer classes of laboring folk," through an injunction restraining their activities. The petition also asked for a receiver to take charge of the defendant's records and papers pertaining to usurious loans and for the liquidation of their business by making proper credits upon accounts of borrowers for all usurious interest exacted. The opinion recites some of the unconscionable practices of this

356

class of offenders, including the circumvention of "laws which the humaneness of our Legislature has enacted for the very purpose of protecting the indigent poor from such usurious exactions as those perpetrated by defendants." The business, said the court, is not only illegal "but is a grievous antisocial iniquity * * * and, when its practice assumes the proportions and prevalence alleged by the plaintiff, a court of equity should not hesitate to suppress it." The several reasons assigned for the conclusion that the operations might be suppressed by injunction are comprehended by the general term of public policy.

Counsel in the briefs filed as amici curiæ on the side of the commonwealth relate other schemes and methods to achieve the ends charged. Counsel for appellee frankly informs us there is no such person as "W. L. Day" charged in the indictment, and says that is but a name for bookkeeping purposes; also that Buckman is a nonresident of the state. Perhaps some of these things might well have found a place in the indictment; but we cannot overleap the record in considering the case. Upon a trial the evidence would be limited to the methods charged.

The indictment charges a conspiracy to do an unlawful act and to accomplish it in part by unlawful means. Though not so denominated, the description is that of extortion, which in its broad sense is a wrongful exaction of money or other valuable thing, either by compulsion, by actual force, or by the force of motives applied at will. A conspiracy to extort money is indictable at common law. Wharton, sec. 1646. We have affirmed a judgment of conviction of the common-law offense of conspiracy to falsely accuse a person of crime for the purpose of extorting money from him. Rutland v. Commonwealth, 160 Ky. 77, 169 S. W. 584. So, too, is it an indictable common-law offense to conspire to cheat and defraud another or the public. This has been done in a great many ways as is shown in the reported cases. Lambert v. People, 9 Cow. (N. Y.) 578; Roberson's Kentucky Criminal Law, sec. 212; Wharton, secs. 1612, 1614; Brill, sec. 499. In State of New Jersey v. Martin, 77 N. J. Law, 652, 73 A. 548, 549, 24 L. R. A. (N. S.) 507, 134 Am. St. Rep. 814, 18 Ann. Cas. 986, some of the practices of the business reflected in the indictment before us are related and the

business held punishable as the operation of a disorderly house, there described as "any place of public resort in which illegal practices are habitually carried on." But because of a difference in statutes, this court held in Commonwealth v. Mutual Loan & Trust Company, 156 Ky. 299, 160 S. W. 1042, 50 L. R. A. (N. S.) 1171, that the application of that offense could not be made here.

To willfully obstruct or prevent public justice or to do any act injurious to the administration of law is not only a misdemeanor but is obviously a violation of public policy. So a conspiracy which has that effect is clearly an indictable offense. The incessant activity and novel inventions of the unprincipled have given rise to unlimited schemes to effect that purpose. Whatever those means are, if that is their object, a conspiracy to use them is punishable; and it makes no difference if the proceeding is a criminal or civil one. Roberson's Kentucky Criminal Law, sec. 213; Wharton, secs. 1639, 1647; 12 C. J. 565. In People v. Spiro, 71 Misc. 362, 363, 129 N. Y. S. 183, it was held that charging conspiracy to prevent personal service of a summons in a designated suit charges the offense of conspiracy to obstruct justice.

It is commonly written that where the object of a conspiracy is unlawful, the indictment does not need to allege the means by which the conspiracy was accomplished, for the means are immaterial (12 C. J. 545; 5 R. C. L. 16), but where the object is not criminal or illegal, and the vice consists in the means employed to effect the purpose, the indictment should set forth those means, which must be such as to constitute an offense at common law or the statute. Harris v. Commonwealth, 113 Va. 746, 73 S. E. 561, 38 L. R. A. (N. S.) 458, Ann. Cas. 1913E, 597; 5 R. C. L. 1082. In view of the provisions of sections 122-124 of our Criminal Code of Practice requiring certainty and definiteness, perhaps the general rule in respect to the first class of cases would not be altogether applicable to the practice in this state.

The amicus curiæ filing brief on the appellee's side submits that the common-law offense of conspiracy of the sort charged is so indefinite and uncertain that it should not be recognized by the court. He would assimilate the view to the attitude of the courts under

which is held invalid statutory laws that are so indefinite and uncertain as to be incapable of rational understanding or enforcement. We think the better comparison or analogy is to look upon the offense and the law as fraud, deceit, cheating, and kindred wrongs are viewed. They are not capable of exact definition or delineation in the abstract, but when it comes to concrete considerations the courts have pretty well hammered the nebulous character of those wrongs into such shape as to make an offense recognizable. So, although in the abstract conspiracy of this sort must be loosely defined, an enlightened conscience should have no difficulty in recognizing a wrong as being embraced within its wide compass.

4. Measuring the indictment by the foregoing considerations, the court is of the opinion that it states a public offense.

Wherefore, the judgment is reversed.

Whole court sitting.

Clay, Justice (dissenting).

I am unable to concur in the majority opinion. However indefensible the exaction of usury may be, it is a matter that should be regulated by the Legislature and not by the courts. Already the conspiracy doctrine has been worked overtime, and should not be extended unless plainly required. When a court on the theory of conspiracy declares an act to be a crime, which was not recognized as a crime at the time it was done, its decision savors strongly of an ex post facto law. Briefly stated a criminal conspiracy is a combination of two or more persons by concerted action to accomplish some criminal or unlawful purpose, or to accomplish some purpose not in itself criminal or unlawful, by criminal or unlawful means, Sparks v. Commonwealth, 89 Ky. 644, 20 S. W. 167. Stripped of surplusage, the indictment alleges a conspiracy to charge usury, and as part of the plan the failure of the defendants properly to file certain statements required by statute. At common law, as adopted in Kentucky, it was not a crime to charge usury, and it has never been made so by statute. Therefore, it was essential to a good indictment to allege that the defendants charged usury by criminal or unlawful means. That, of course, has reference to the method of obtaining the loan, and not to wholly discon-

nected steps which the lenders failed to take. It was not alleged that the defendants, for the purpose of effecting the loans, resorted to force, threats, intimidation, or fraud. On the contrary, the case is one where the borrowers were not imposed upon in any way, but willingly and freely entered into the arrangement. In the circumstances, the indictment does not allege facts showing that the defendants resorted to unlawful means.

The necessity of protecting the public, and particularly the laboring man, is much stressed, but that alone will not authorize the court to hold an indictment good. Moreover, it is not perceived how prosecutions like the one in question may help the situation, as separate individuals may still continue the business of lending money at exorbitant rates without being subject to punishment.

The decision not only presents a strained application of the conspiracy doctrine, but its chief danger lies in the fact that for all time to come it will be the basis for the creation of new crimes never dreamed of by the people.

I am authorized to say that Judge Dietzman concurs in this dissent.