199 So. 886

### WILLIS v. BUCHMAN.

### 3 Div. 829.

Court of Appeals of Alabama.

April 30, 1940.

Rehearing Denied June 4, 1940.

Appeal Dismissed on Mandate Feb. 4, 1941.

34

Ball & Ball and Richard A. Ball, all of Montgomery, for appellee.

Walter J. Knabe, of Montgomery, for appellant.

J. W. Patton, of Montgomery, for Louisville & N. R. Co., amicus curiæ.

RICE, Judge.

Appellee's counsel state the situation involved on this appeal as follows, to-wit:

"The plaintiff, appellee here, brought suit against the defendant, W. B. Willis, in the Common Pleas Court of Montgomery County on a promissory note for $21.-00. The defense was usury. That court finding no usury in the transaction in connection with which the note was given rendered judgment for the plaintiff.

"The defendant appealed to the Circuit Court where the case was tried by the court without a jury. The defendant again

pleaded usury and the Circuit Court trying the case without a jury after hearing the evidence and finding no usury in the transaction rendered judgment for the plaintiff for $21.10.

"The defendant then took this appeal. The plaintiff then faced with the expense of resisting an appeal in which the expense would be out of all proportion to the amount of the judgment cancelled the judgment and discharged it of record and made a motion to dismiss the appeal.

"Notwithstanding the cancellation of the judgment and despite the fact that the defendant now stands free and clear of any claim against him by reason of the note, this appeal is nevertheless being prosecuted in his name. What motive exists for a debtor who has been relieved of his debt to go to further expense in connection with the cancelled debt is not apparent upon the record."

We first consider appellee's motion to dismiss the appeal.

Of course it will be observed that we have *quoted* his counsel's statement of the facts. This was for two reasons: (1) Because the *facts* as they state them are correct; and (2) in order that we may dilate, somewhat, upon their obvious *conclusions,* as contained in said "statement."

Alabama Loan Company is a trade name under which V. L. Buchman of Memphis, Tennessee, operates a loan office at Montgomery, Alabama, which has been operating since about 1928. Formerly it was operated as a straightout money lending business, charging a borrower $6.60 for a loan of $15, payable in weekly installments over a three months period.

About four years before this trial Mr. Buchman set up a merchandise coupon device, by which those who come to borrow money are required to purchase a coupon. The coupon "is good for 10% of the purchase price of merchandise sold by A. J. Kaufman and Son, Montgomery, Alabama;" or will be accepted "as cash equal to 25%'" of the purchase price of merchandise, of which the "Merchants' Coupon Service Company, 275 Broadway, New York City" is the distributor. The coupons provide that they "are acceptable only when mailed to the office of Merchants' Coupon Service Company, or through the above agent."

Among the articles listed as handled by the Merchants' Coupon Service Company are: "Binoculars," "Book Ends," "Brooches," "Cameras," "Cigarette Cases," "Clocks," "Coffee Percolators," "Crystal Jewelry," "Cutlery," "Desk Sets," "Diamonds," "Dolls," "Electric Lamps," "Emblems," "Field Glasses," "Fountain Pens," "Fraternity Jewelry," "Home Electric Appliances," "Laundry Irons," "Leather Novelties," "Luggage," "Medals," "Movie Cameras," "Movie Projectors," "Musical Novelties," "Pearls," "Perfumery," "Pewterware," "Prize Cups," "Rosaries," "Silverware," "Silver Novelties," "Smoker Sets," "Tires," "Toasters," "Toiletware," "Trophies," "Travelling Bags," "Umbrellas," "Vacuum Bottles," "Vacuum Cleaners," "Vanity Cases," "Waffle Irons" and "Watches."

Mr. Buchman *advertises* to lend money but does not advertise to sell merchandise.

The borrower in this case, Willis, appellant, went to the Alabama Loan Company on Dec. 14 to borrow $15. He was required, in order to secure the $15, to sign a note for $21 at the legal rate of interest, payable at the rate of $1.75 per week, in twelve weekly payments. He was also required to sign a receipt in which he stated that he had purchased from E. V. Rush (Alabama Loan Company's agent in full charge of its Montgomery office), as agent for the Merchants' Coupon Service Company, a coupon of a value equal to $7.20, for the price of $6.

Willis testified that he had not asked for a coupon and that he told E. V. Rush when he started to make out the coupon that "he could keep it because he could not use the coupon but merely wanted the $15.00." Rush testified in reference to this particular of the transaction that he didn't remember that Mr. Willis told him he didn't want the coupon; or, if Willis did tell him, he didn't hear it.

Rush testified that the Merchants' Coupon Service Company was headed by a man named Shaffer in New York but that he did not know whether it was a company or a corporation; that Mr. Buchman made connection with the Merchants' Coupon Service Company as far as he knew; that he handled the coupons and made loans all as part of his work for V. L. Buchman in that there was no other agent in Montgomery for the Merchants' Coupon Service Company except himself, and that

he received no independent compensation but was paid by Buchman; that he had not been to New York since his connection with the Merchants' Coupon Service Company and did not know whether they had an office at 275 Broadway or merely a place to receive mail; that he did not know whether the company was Mr. Buchman's business or not.

It was then admitted in open court that Mr. Rush did not know the "workings of the Merchants' Coupon Service Company whatever."

Willis testified that he had borrowed from this appellee on four or five prior occasions and that each time he had gotten a coupon except the first time, but that he had never asked for any coupon, and that he, on each occasion, went to the Alabama Loan Company to borrow money and not to buy coupons. And that he had never used any of the coupons.

Rush testified that "possibly seven or eight hundred or maybe more" coupons were issued each month; that he kept two large catalogues in his office with merchandise advertised in them and that customers could use them at any time during the day; that some days the catalogues were used and some days were not; that he wouldn't say half the borrowers used them but would say 25% used them; that they distributed folders advertising merchandise and had from five to ten thousand of them.

A copy of one of these folders is set out in the transcript; and we note it emblazons to the world that one may "Trade at Stores that use Merchants' Coupon Service and save from 25% to 50% from Retail Prices;" which, from the testimony in the case seems to be *untrue*—even granting that the borrower was financially able to avail himself of the *use* of the coupon.

Rush testified that he did not know how many of the coupons were actually used.

In reference to the number of coupons which were used at the store of A. J. Kaufman and Son, which was the only other place they could be used except at the Merchants' Coupon Service Company in New York, Mr. A. J. Kaufman of that firm testified that they had had the connection for two or three years but that they never took in any coupons that he knew of. He stated that one or two had come in with coupons and the clerks in

the store had asked him what the coupons meant. That in each case the person presenting the coupon thought they could get merchandise for the coupon, but when they found out that they could only get a discount, they refused to buy. As Mr. Kaufman phrased it: "They thought they could exchange it the same as money."

Mr. Kaufman also testified that as far as his company was concerned it was merely an advertising proposition and that the Alabama Loan Company did not pay them anything.

Mr. Rush testified—and we believe none of the testimony in the case was disputed—that in their loans there was no service charge whatsoever; that the amount of the coupon was required to be varied in accordance with the length of time for which he made the loan; and that he did not know whether Mr. Buchman paid anything to the Merchants' Coupon Service Company for the coupons.

We believe it is the law in this State that "as appellate courts do not sit to give opinions on moot questions or abstract propositions, the appeal or writ of error will be dismissed where no actual controversy exists between the parties at the time of the hearing, *unless the question involved is a matter of public interest*." (Italics ours.) 4 C.J.S., Appeal and Error, § 1354.

And, further: "Since motions to appeals must be considered from the point of view that the law favors appeals, and that a hearing or review on the merits is favored over dismissal or other disposition, motions to dismiss are not looked upon with favor, and in a doubtful case the appeal will be maintained." 4 C.J.S. Appeal and Error, § 1377a.

Under the law as we have quoted it in the two last preceding paragraphs—and it is contrary to no holding by our Supreme Court that has been cited to us, or that we have found—we think, and hold, the motion to dismiss the appeal should be denied. It is so ordered.

The question involved here seems to us to be of the gravest *public interest*.

That view is confirmed by the fact—the "tacit fact"—that while appellee asseverates, as his basis for the motion to *dismiss the appeal*, "that the expense of resisting the appeal was so greatly disproportionate to the amount of the judgment that the plaintiff filed in the circuit

court a complete discharge and cancellation of said judgment," yet, appellee *has,* nevertheless, *resisted the appeal,* by having his counsel file here an able brief *on the merits* in his behalf. And we are unable to see what more he could have done by way of *resisting the appeal* had the amount of the judgment been hundreds of times as great as it was.

We recognize the limited nature of our duties, here. But we believe it is a fact, known of all men, that, as a writer quoted in the brief filed here, amicus curiae, has said: "The unregulated small loan business has in fact produced a chain of evil consequences." And, that, "Of this, experience has furnished conclusive demonstration. Borrowers have almost invariably been poor people at the time of their most exigent need. Untrained in the refinements of business negotiations, usually ignorant of the existence of usury laws, and incapable of using the rights which the law gave them, they have often fallen easy victims of the unconscionable moneylenders. * * * * The sufferers have been the economically weak. The conditions under which lender and borrower met lacked that equality of bargaining power so essential to just business transactions."

And the brief filed here on appellee's behalf discloses that a *decision of this court* has been used as a shield behind which he might carry on, unmolested, the scheme disclosed by the evidence in this case.

Said decision—reported in Hornsby v. Rush, 26 Ala.App. 170, 155 So. 637, certiorari denied in same by our Supreme Court 229 Ala. 68, 155 So. 638—should, we think, *in the public interest,* be here again reviewed. Hence our order, above, denying appellee's motion to dismiss the appeal. To allow appellee to *use said decision* in the *lower court*—where it controls—and then, when a debtor, defeated therein and thereby, seeks to have said decision reviewed in *this* court, where same was promulgated, and where it might be clarified and *explained,* have his efforts forestalled, circumvented, or thwarted, by the simple expedient of appellee's entering a *discharge* of the judgment he had obtained below would not, it clearly seems to us, be *in the public interest.*

We come now to the merits of the case.

Appellee's counsel say: "If the court should conclude that although there is no judgment in existence and although there is no controversy between the parties that it should nevertheless pass upon the validity of the cancelled judgment and if it should reach the merits of this case for consideration, the court will find that the transaction involved in this case was the same type of transaction which was considered and held valid in the Hornsby case (Hornsby v. Rush, supra). Only the amount of the note and the amount of the Coupon is different." But we will come back to this, later.

Our Statute, which has application to this case, is, in pertinent part, as follows, to-wit: "All contracts for the payment of interest upon the loan or forbearance of goods, money, things in action, or upon any contract whatever, at a higher rate than is prescribed in this chapter, are usurious, and cannot be enforced either at law or in equity, *except as to the principal.*" (Italics ours.) Michie's 1936 Cumulative Supplement to the Alabama Code of 1928, Sec. 8567.

The question before us is whether the $6 appellant was required to pay—in order to get his loan of $15—was really the value of the $7.20 coupon of the Merchants' Coupon Service Company of New York, which his receipt states he received in connection with said loan, or was merely *additional interest,* to that prescribed by law, on said loan of $15. If it was merely additional interest, exacted under the color of a sale and purchase of the Coupon, the transaction was, of course, usurious in the extreme. And that's what we think it was.

We will elaborate, somewhat: In Hubachek's Annotations on Small Loan Laws, a work published by Russell Sage Foundation in 1938, we find this, that we think pertinent, at page 146, to-wit: "Questions of usury turn ultimately on the meaning of interest. Interest is compensation for the use of money lent. Whatever thing of benefit comes to the lender as compensation for the use of money is interest, no matter what name it may be given or what expedients may be adopted to conceal the fact that the benefit received is, in essence, compensation for the use of the money. No matter how remote a collateral transaction may seem to be, no matter how shrewdly it is made to appear that a payment to the lender is for something else, *if the facts, taken together and read in the light of human experience, justify a natural inference*

*that the lender received the benefit because · the borrower had the use of. his money and as compensation for the use, the benefit is interest.* As such it must be added to all similar benefits to determine whether the aggregate exceeds the rate of compensation which the lender is permitted to receive." (Italics supplied by us.)

True, as appellee's counsel say: "Mr. Willis purchased the trade Coupon on credit. He promised to pay $6.00, not as interest but as the price of the Coupon. His promise to pay the purchase price of the trade Coupon was not a promise to pay interest on the $15.00 loan. The receipt signed by Willis specifically states that in addition to receiving the $15.00 in cash in connection with which his note had been signed, that he had agreed to purchase and did purchase a $7.20 trade Coupon for the price of $6.00."

■ But it makes no difference what the parties call it. "When a transaction alleged to be usurious *shows no usury on its face,* evidence must be adduced fully to prove some corrupt device or shift to cover usury. The proof required by either party, however, *may properly be drawn by inference from all the circumstances of the case* tending to show the real intent of the parties and the true nature of the transaction in question." 66 C.J. 310; Ely v. McClung (Surety), 4 Port. 128.

■ ·Here, we are persuaded, and hold, that the "proof" required by appellant, to show a "corrupt device or shift to cover usury" is furnished by inferences which may be drawn, and *should* be drawn, from, among others we may omit to mention, but which are apparent from the testimony in the bill of exceptions, the following "circumstances in the case," viz.:

1. Appellee originally made loans (where no coupon was issued), obviously —and, apparently, admittedly—usurious, at a cost to lenders substantially, if not exactly, the same as that under the present device.

2. It is apparent, therefore, that no value was set by *appellee* upon the trade Coupon here sought to be—claimed to be —issued to appellant.

.3. Appellee *could* have produced, but did *not,* evidence showing the actual existence of such a concern as Merchants' Coupon Service Company (if, indeed, there was any such concern).

4. There is no actual proof that any such concern is in—or ever was in—existence. ·

5. Appellant *could not* ' furnish such proof.

6. The cost of the coupon bore a direct, progressive, relation to the amount of the loan, and the time same was to be made for—creating a strong suspicion that the cost of same was the "cost of the loan."

7. The coupons were substantially never used, thus indicating there was no good faith intent that they *should* be used.

8. The terms of the coupon were such that common experience shows that the type of borrower who would resort to appellee for such a loan *could not* use them.

9. The coupons cost appellee nothing.

10. The items to be purchased in New York are essentially luxury items, unsuitable and unsuited to the needs of such borrowers.

In Hubachek's Annotations on Small Loan Laws, supra, at page 164, et seq., we find the following, to-wit:

"Transactions cast in the form of sales of property to. the borrower at more than its market value, imposed as conditions precedent to granting loans, have been held to be subterfuges to evade usury laws. * * * A variation of this device is the practice of requiring the borrower to accept as part of the proceeds of the loan a merchandise Coupon. The Coupon is redeemable only by designated merchants, with whom the lender has made previous arrangements, in conjunction with the purchase of goods of a specified price. * * * Ordinarily the borrower is unable and does not intend to make the purchase which is necessary to redeem the Coupon. The monetary value of the Coupon is usually doubtful. When a lender makes a practice of requiring the borrower to accept such a Coupon, there is a clear natural inference that it is a device to evade an interest limitation."

"Each of the following four cases involved such a practice and was tried on stipulated facts which seem to have been dictated by the lender. The stipulations did not show a settled practice of requiring borrowers to accept Coupons and did not indicate that the Coupons were of doubtful value. It was stipulated that the lender did not know that the borrower did not intend to use the Coupon. In three cases the courts decided for the lender. Hornsby v.

Rush, 26 Ala.App. 170, 155 So. 637; Id., 229 Ala. 68, 155 So. 638; Hogan v. Thompson, 186 Ark. 497, 54 S.W.2d 303; Page v. Johnson, 174 Okl. 516, 51 P.2d 301.

"But in one case, in spite of the stipulated facts, the court held the transaction to be a usurious loan and pointed out the improbability that necessitous borrowers would make use of the Coupon or that such use was within the contemplation of either party. Glover v. Buchman, Tex.Civ.App., 1937, 104 S.W.2d 66."

For our part, we agree with the Court of Civil Appeals of Texas, in the case of Glover v. Buchman just cited—where the scheme seems to be exactly that we are considering, with what appears to be the same man as appellee in that case and ours—that "Not to held that this plan, which, in nine cases out of ten, must result in the lender receiving usury, does not disclose the intention to exact usury would be * * * 'to sacrifice substance to form and thwart, by literal interpretation of a few words, the clear intent and understanding of both parties.'" [104 S.W.2d 68.] And see as supporting this view: Buchman v. Holmgram, Tex.Civ.App., 81 S.W.2d 177; Cash Service Co. v. Ward et al., 118 W.Va. 703, 192 S.E. 344; In re Graham, D.C., 22 F. Supp. 233; Commonwealth ex rel. Grauman v. Continental Co., Inc., 275 Ky. 238, 121 S. W.2d 49; Jernigan, Bank Com'r v. Loid Rainwater Co., 196 Ark. 251, 117 S.W.2d 18; Commonwealth of Kentucky v. Donoghue, 250 Ky. 343, 63 S.W.2d 3, 89 A.L.R. 819.

Now coming back for a moment to our own case of Hornsby v. Rush, supra, the holding in which appellee's able counsel urge upon us a bar to our reaching the conclusion we have hereinabove announced, we observe:

1. It was tried upon an agreed statement of facts, which, the author of Hubachek's Annotations on Small Loan Laws, supra, says, "Seem(s) to have been dictated by the lender."

2. The facts therein stipulated are not the same as the facts shown by the evidence in this case.

3. And, specifically, the facts here support the inference that Merchants' Coupon Service Company is but a fictitious name for Buchman, the lender, whereas it was stipulated in the Hornsby case that it was a large company engaged in the business of handling certain merchandise.

4. The borrower, here, did not want the coupon and so advised the lender, and never used same; but it was stipulated in the Hornsby case that the borrower agreed to purchase the coupon and actually used it to purchase merchandise at the standard retail price.

5. It is shown here that there was a continuity in the course of dealing of the lender (appellee); an issuance of many thousands of these coupons per annum; and it is fairly inferable that substantially none were ever used by the borrowers. In the Hornsby case, for aught that appeared, the only transaction might have been an isolated one.

6. The significant continuity of practice, whereby the lender charges (substantially) the same for a loan with the coupon that he formerly charged for a loan without the coupon did not appear in the Hornsby case. This circumstance is strongly persuasive of the fact that the charge now is just what it always was, to-wit, a charge for the use of money.

7. It did not appear in the Hornsby case that the cost of the coupon increases with the length of the loan.

8. It did not appear in the Hornsby case that the entire cost of the coupon represented profit to the lender. This fact, alone, according to the holding in Cash Service Co. v. Ward, supra, rendered the transaction usurious.

So that, without troubling to re-examine our holding in the said Hornsby case, it is sufficient to here say that it should be strictly limited to the facts as therein stipulated. As so limited, it in no manner controls us, here.

We have, as appears, gone to considerable length in giving, partially, our reasons for the conclusion hereinabove announced. But the importance, as we see it, of the question involved, to literally thousands of what we are tempted to call our "underprivileged citizenship," seemed to us to justify the tedium.

Being convinced from the evidence that the "technically elegant scheme" devised by appellee was but a ruse to take the transaction here without the ban of our laws against usury, we have striven to fall in with the sentiments of Lord Mansfield, as quoted in Cash Service Co. v. Ward, supra, [118 W.Va. 703, 192 S.E. 346], that, when a transaction exacts usury, "The wit of man

cannot find a shift to take it out of the statute."

The judgment of the court below is reversed. And one here rendered that appellee recover from appellant, *without interest,* the sum of $15—the amount of his loan.

And it appearing that the amount of said judgment has been satisfied and discharged it is ordered that appellant go hence, with his costs.

Reversed and rendered.

### Opinion after Remandment.

■ The end of the law, for *us,* is Code 1923, § 7318, which provides: "The decisions of the supreme court shall govern the holdings and decisions of the court of appeals, and the decisions and proceedings of such court of appeals shall be subject to the general superintendence and control of the supreme court as provided by section 140 of the constitution of the state." And, of course, the "decisions of the supreme court" referred to in said Code Section can only mean the "decisions of the *majority*" of the Supreme Court.

■ So, here, by the decision of Mr. Justices Thomas, Foster, Knight, and Livingston, as evidenced by their "Per Curiam", 240 Ala. 386, 199 So. 892, utterance to that effect, we must, and do, now enter an order dismissing this appeal out of this court.

Appeal dismissed.